17-737 (L)
*American Trucking Ass'ns, Inc. v. N.Y. State Thruway Auth.*

# In the
# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM 2017
No. 17-737 (L), 17-873 (Con)

AMERICAN TRUCKING ASSOCIATIONS, INC., WADHAMS ENTERPRISES, INC., LIGHTNING EXPRESS DELIVERY SERVICE INC., WARD TRANSPORT & LOGISTICS CORP., ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, AMERICAN BUS ASSOCIATION, DATTCO, INC., STARR TRANSIT CO., INC., ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,
*Plaintiffs-Appellants*,

v.

NEW YORK STATE THRUWAY AUTHORITY, NEW YORK STATE CANAL CORPORATION, THOMAS J. MADISON, JR., IN HIS OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF THE NEW YORK STATE THRUWAY AUTHORITY, HOWARD MILSTEIN, IN HIS OFFICIAL CAPACITY AS CHAIR OF THE NEW YORK STATE THRUWAY AUTHORITY/CANAL CORPORATION BOARDS OF DIRECTORS, DONNA J. LUH, IN HER OFFICIAL CAPACITY AS VICE-CHAIR OF NEW YORK STATE THRUWAY AUTHORITY/CANAL CORPORATION BOARDS OF DIRECTORS, E. VIRGIL CONWAY, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE NEW YORK STATE THRUWAY AUTHORITY/CANAL CORPORATION BOARD OF DIRECTORS, RICHARD N. SIMBERG, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE NEW YORK STATE THRUWAY AUTHORITY/CANAL CORPORATION BOARD OF DIRECTORS, BRANDON R. SALL, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE NEW YORK STATE THRUWAY AUTHORITY/CANAL

CORPORATION BOARD OF DIRECTORS, J. RICE DONALD, JR., IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE NEW YORK STATE THRUWAY AUTHORITY/CANAL CORPORATION BOARD OF DIRECTORS, JOSE HOLGUIN-VERAS, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE NEW YORK STATE THRUWAY AUTHORITY/CANAL CORPORATION BOARD OF DIRECTORS, BILL FINCH, IN HIS OFFICIAL CAPACITY AS ACTING EXECUTIVE DIRECTOR OF THE NEW YORK STATE THRUWAY AUTHORITY, JOANNE M. MAHONEY, IN HER OFFICIAL CAPACITY AS CHAIR OF THE NEW YORK STATE THRUWAY AUTHORITY/CANAL CORPORATION BOARDS OF DIRECTORS, ROBERT L. MEGNA, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE NEW YORK STATE THRUWAY AUTHORITY/CANAL CORPORATION BOARDS OF DIRECTORS, STEPHEN M. SALAND, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE NEW YORK STATE THRUWAY AUTHORITY/CANAL CORPORATION BOARDS OF DIRECTORS,
*Defendants-Appellees.*

————

Appeal from the United States District Court
for the Southern District of New York.
Nos. 1:13-cv-08123 and 1:17-cv-00782 — Colleen McMahon, *Chief District Judge*.

————

ARGUED: MARCH 6, 2018
DECIDED: MARCH 29, 2018

————

Before: CALABRESI, CABRANES and LOHIER, *Circuit Judges.*

———————

Plaintiffs-Appellants American Trucking Associations, Inc. and all those similarly situated appeal from the judgment of the U.S. District Court for the Southern District of New York (Colleen McMahon, *Chief District Judge*) granting a motion to dismiss of Defendants-Appellees New York State Thruway Authority and its aligned state entities. Plaintiffs-Appellants claim that the New York State Thruway Authority violated the Dormant Commerce Clause when it used surplus revenue from highway tolls to fund the State of New York's canal system. The District Court dismissed this claim, concluding that Congress authorized the Thruway Authority to allocate highway tolls to canal uses.

We **AFFIRM** the District Court's judgment.

———————

> CHARLES A. ROTHFELD, Evan M. Tager, Matthew A. Waring, Mayer Brown LLP, Washington, DC; Richard Pianka, ATA Litigation Center, Arlington, VA, *for Plaintiffs-Appellants.*
>
> ANDREW W. AMEND, Senior Assistant Solicitor General, of counsel, (Barbara D. Underwood, Solicitor General, Steven C. Wu, Deputy Solicitor General, *on the brief*), *for* Eric T. Schneiderman,

Attorney General, State of New York, *for Defendants-Appellees.*

————

JOSÉ A. CABRANES, *Circuit Judge*:

The questions presented are: (1) whether the District Court correctly dismissed the Dormant Commerce Clause claims of plaintiffs, challenging the authority of defendants to allocate surplus highway toll revenues to New York's canal system; and (2) whether the District Court properly determined that defendants did not waive the argument that Congress authorized them to depart from the Dormant Commerce Clause.

American Trucking Associations, Inc. and its fellow plaintiffs (jointly, "ATA") claim that the New York State Thruway Authority and its aligned state entities (jointly, the "Thruway Authority") violated the Dormant Commerce Clause when it used surplus revenue from highway tolls to fund New York State's Canal System ("the Canal System"). The District Court dismissed this claim, finding that Congress specifically authorized the Thruway Authority to allocate highway tolls to canal uses. ATA further claims that the District Court abused its discretion in reaching the question of congressional authorization because the Thruway Authority did not discover or raise this argument until several years into the litigation.

We conclude that Congress evinced unmistakably clear intent to authorize the Thruway Authority to allocate highway tolls to support the Canal System. We also conclude that the District Court had discretion to reach the question of congressional authorization. Accordingly, we **AFFIRM** the judgment of the District Court.

## I. BACKGROUND

### A. The Thruway Authority's Tolling Powers

The New York State Thruway Authority is a public benefit corporation, created in 1950 by the New York State Legislature to construct and operate transportation facilities.[1] Since its establishment, it has operated the Governor Thomas E. Dewey Thruway System (the "Thruway"), a 570-mile cross-state highway that is a "major artery of interstate commerce in the Northeast" United States and a "critical route for commercial truckers serving the region."[2]

New York originally funded the Thruway through bond issuances, and authorized the Thruway Authority to charge tolls both to repay the bonds and to support maintenance and operations.[3] In

---

[1] *See* N.Y. Public Authorities Law ("PAL") §§ 352-353.

[2] *Am. Trucking Ass'ns, Inc. v. N.Y. State Thruway Auth.*, 795 F.3d 351, 354 (2d Cir. 2015).

[3] PAL § 354(8); *see also* Ch. 143, § 1, 1950 N.Y. Laws 653, 655, 659 (enacting PAL § 359(1)). *See generally* ROBERT A. CARO, THE POWER BROKER 15-19, 615-31, 633-34 (1974) (discussing Robert Moses's use of public authorities to shape infrastructure in New York, his utilization and expansion of the concept of public

1956, Congress passed the Federal-Aid Highway Act, which incorporated existing toll highways, including the Thruway, into the Interstate Highway System, but prohibited the use of any federal funds to construct or improve such highways.[4] The Thruway and other toll highways became eligible for federal financial support only when, in 1978, Congress enacted the Surface Transportation Assistance Act ("STAA").[5] Section 105 of that statute mandated that, in order to receive federal financial aid, state public authorities responsible for toll highways in the Interstate Highway System had to discontinue levying tolls once they had collected sufficient revenues to retire outstanding bonds.[6] If those authorities failed to make a toll road free once they had collected sufficient tolls to retire

authorities, the role of bond issuances in raising financing for and perpetuating public authorities, and the role of tolls in sustaining public authorities).

[4] *See* Pub. L. No. 84-627, § 113(a), 70 Stat. 374, 384 (1956).

[5] Pub. L. No. 95-599, 92 Stat. 2689 (1978).

[6] § 105, 92 Stat. at 2692-93. Section 105's requirements were effectuated through "tripartite agreements" between the relevant state public authority, the state highway department, and the U.S. Secretary of Transportation. Pursuant to section 105, the Thruway Authority, the New York State Department of Transportation, and the U.S. Department of Transportation's Federal Highway Administration entered into a Tripartite Agreement in July 1982. Among other provisions, the Agreement provided that the Thruway Authority could continue to collect tolls until it paid off its outstanding debt, projected to occur in 1996. *See* J.A. 167-72.

those bonds, STAA required them to repay the federal government for the financing it had provided them.[7]

Against this background, Congress enacted the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA"), the statute at issue here.[8] Through ISTEA, Congress sought to foster "a National Intermodal Transportation System," consisting of "all forms of transportation in a unified, interconnected manner."[9] To do so, ISTEA freed states from their obligation under the STAA to repay the federal government should they continue to collect tolls after retiring outstanding debts, and granted them greater flexibility to operate toll facilities and use toll revenues for a variety of transportation projects.

Two provisions of ISTEA stand at the heart of this case. The first, section 1012(a), authorized state public authorities to collect highway tolls without repaying the federal government, so long as those funds "will be used first for debt service, for reasonable return on investment of any private person financing the project, and for the costs necessary for the proper operation and maintenance of the toll facility."[10] Once a state certified adequate maintenance, it could use

---

[7] § 105, 92 Stat. at 2693 ("[I]f, for any reason, a toll road receiving Federal assistance under this section does not become free to the public upon collection of sufficient tolls, as specified in the preceding sentence, Federal funds used for projects on such toll road pursuant to this section shall be repaid to the Federal Treasury[.]").

[8] 23 U.S.C. § 129; Pub. L. No. 102-240, 105 Stat. 1914 (1991).

[9] § 2, 105 Stat. at 1914.

[10] § 1012(a)(3), 105 Stat. at 1936-37.

any excess toll revenues "for any purpose for which Federal funds may be obligated by a State under [Title 23]."[11]

As part of ISTEA, Congress simultaneously broadened the list of purposes for which states could use federal funds under Title 23. The expanded list included "transportation enhancement activities," such as "historic preservation, rehabilitation and operation of historic transportation buildings, structures, or facilities (including historic railroad facilities and *canals*) ."[12]

In the second provision, section 1012(e), Congress enacted a "Special Rule" that largely paralleled section 1012(a) but added specific conditions regarding two toll facilities: the New York State Thruway and the Fort McHenry Tunnel in Maryland. Regarding the Thruway, it provided that the Thruway Authority could use excess toll revenues to cover "costs associated with transportation facilities under [its] jurisdiction . . . , including debt service and costs related to the construction, reconstruction, restoration, repair, operation and maintenance of such facilities."[13]

---

[11] *Id.*

[12] 23 U.S.C. § 101(a); ISTEA § 1007(c), 105 Stat. at 1931 (emphasis added). Although the text of 23 U.S.C. § 101 has been amended from time to time, as the District Court stated, "none of the amendments eliminated the statutory authorization allowing the Thruway Authority to spend excess toll revenues (i.e., toll revenues not needed for Thruway maintenance) on the canals." *Am. Trucking Ass'ns, Inc. v. N.Y. State Thruway Auth.*, 238 F. Supp. 3d 527, 534 (S.D.N.Y. 2017).

[13] § 1012(e), 105 Stat. at 1939.

Following the passage of ISTEA, in 1992 the New York State Legislature directed the Thruway Authority to assume management of the Canal System.[14] At all times relevant to these appeals, the Thruway Authority managed the Canal System.

### B. The Canal System

The rise of the Interstate Highway System, a marvel of American infrastructure, cemented the decline of perhaps the most awesome earlier such marvel: the New York Canal System. That system is "a network of waterways that stretches across upstate New York, including the Erie, Oswego, Champlain, Cayuga, and Seneca Canals."[15] In the nineteenth century, it served as "the model for canal-building throughout the world" and fueled "the unprecedented development and prosperity that came not alone to New York State but to . . . the whole country."[16] In the words of Senator Daniel Patrick Moynihan of New York—then chairman of the Water Resources, Transportation, and Infrastructure Subcommittee of the Senate Committee on Environment and Public Works, and the principal architect of ISTEA—the Canal System is "what has made America great."[17]

---

[14] N.Y. Canal Law § 6.

[15] *Am. Trucking Ass'ns*, 795 F.3d at 355 (internal quotation marks omitted).

[16] Roy G. Finch, *The Story of the New York State Canals* 4 (rev. ed. 1998), https://www.canals.ny.gov/history/finch_history_print.pdf.

[17] *Field Hearings Before the S. Comm. on Env't & Public Works and the Subcomm. on Water Res., Transp., & Infrastructure*, 102nd Cong. 305 (Apr. 5, 1991) (statement of

As road and air transportation proliferated, however, the Canal System largely became "a recreational byway, drawing pleasure boats, fishing lines and the occasional canal fan."[18] Traditionally supported through taxpayer funds and managed by the New York Department of Education, the Canal System, as noted, was transferred to the management of the Thruway Authority in 1992.[19] The Thruway Authority began funding the Canal System principally through excess highway toll revenues. Between 1992 and 2016, it expended approximately 9 to 14 percent of Thruway tolls to the Canal System.[20]

---

Sen. Daniel Patrick Moynihan, member, S. Comm. on Environment and Public Works), J.A. 210. Legislators from both parties credited Senator Moynihan "with masterminding much of the legislation." Lindsey Gruson, *Transit Bill Seen as Boon to Metro Area*, N.Y. TIMES, Nov. 27, 1991, https://www.nytimes.com/1991/11/27/nyregion/transit-bill-seen-as-boon-to-metro-area.html. For the history of ISTEA's passage, see Richard F. Weingroff, *Creating a Landmark: The Intermodal Surface Transportation Act of 1991*, PUB. ROADS, Nov.-Dec. 2001, https://www.fhwa.dot.gov/publications/publicroads/01novdec/istea.cfm.

[18] Jesse McKinley, *Afloat on the Erie Canal: Sonar Gear, Ferris Wheel Parts and Beer Tanks*, N.Y. TIMES, May 28, 2017, https://www.nytimes.com/2017/05/28/nyregion/erie-canal-rebound-commercial-shipping.html. In recent years, however, the Canal System has experienced an uptick in commercial shipping thanks to its "use as a niche waterway for cargo whose size or weight make it impossible, impractical or too expensive to haul any other way," including electrical turbines, Navy equipment, pedestals for a Ferris wheel under construction in Staten Island, and even giant tanks of beer. *Id.*

[19] *Ante*, note 14.

[20] *Am. Trucking Ass'ns, Inc. v. N.Y. State Thruway Auth.*, 199 F. Supp. 3d 855, 879 (S.D.N.Y. 2016), *vacated*, 238 F. Supp. 3d 527 (S.D.N.Y. 2017). In 2016, the New York State Legislature transferred jurisdiction over the Canal System to the New

### C. Procedural History

In November 2013, ATA, a trucking industry trade group, and three of its members brought a class action suit against the Thruway Authority, the New York State Canal Corporation, and certain Thruway officials, alleging that they violated the Dormant Commerce Clause by using Thruway tolls to fund the Canal System.[21] In August 2014, the District Court dismissed the complaint for failure to join the State of New York as a necessary party.[22] The following year, we vacated that judgment and remanded for further proceedings.[23]

On remand, in August 2016, the District Court granted partial summary judgment to the ATA, finding that the allocation of Thruway tolls to the Canal System violated the Dormant Commerce Clause.[24] At the time, the Thruway had not yet contended that Congress had expressly authorized the use of Thruway tolls for canal

---

York Power Authority, which is not a party to these appeals. *See* N.Y. Canal Law § 5. The Legislature shifted control as a means of providing financial relief to the Thruway Authority, which had been spending roughly $87 million annually for canal operations and debt. *See* Rick Karlin, *NY Power Authority to Absorb Canal System*, TIMES UNION (Albany), Apr. 6, 2016, https://www.timesunion.com/local/article/NY-Power-Authority-to-absorb-canal-system-7233185.php.

[21] J.A. 22-45.

[22] *Am. Trucking Ass'ns, Inc. v. N.Y. State Thruway Auth.*, No. 13 Civ. 8123, 2014 WL 4229982, at *6-7 (S.D.N.Y. Aug. 6, 2014).

[23] *Am. Trucking Ass'ns*, 795 F.3d at 360-61.

[24] *Am. Trucking Ass'ns*, 199 F. Supp. 3d at 878.

purposes, and neither the District Court nor the parties considered any such authorization.

Before the District Court could rule on ATA's class-certification motion or hold a damages trial, however, the Thruway Authority discovered information indicating that Congress had indeed authorized it to devote surplus highway toll revenue toward the Canal System.[25] It moved to dismiss plaintiffs' action for failure to state a claim. On February 28, 2017, the District Court granted that motion, finding that "Congress decided, with great specificity, to exempt the New York State Thruway Authority's expenditure of excess toll revenues on the New York State Canal System from the reach of the Dormant Commerce Clause."[26] The District Court expressed displeasure with the fact that the Thruway Authority failed to discover its defense of congressional authorization for so long, but it ultimately rejected ATA's claim that the Thruway Authority had waived that argument by raising it too late.[27] Accordingly, the District Court vacated its order of August 10, 2016 granting ATA's motion for partial summary judgment and denying defendants' cross-motion for summary judgment.[28]

On February 1, 2017, while the *ATA* case was pending, the American Bus Association ("ABA") and several of its members filed

---

[25] *Am. Trucking Ass'ns,* 238 F. Supp. 3d at 532.

[26] *Id.* at 541.

[27] *Id.* at 540-41.

[28] *Id.* at 541.

a parallel action against the Thruway Authority and the other defendants, raising the same Dormant Commerce Clause claims. Soon after the District Court dismissed *ATA*, it entered an order dismissing the *ABA* case "[f]or substantially the reasons discussed by the court" in *ATA*.[29]

## II. DISCUSSION

### A.      Standard of Review

We review a district court's grant of a motion to dismiss *de novo*.[30] We review for abuse of discretion a district court's decision that a party did not waive an argument by failing to raise it earlier in the proceedings.[31]

### B. Whether Congress Authorized the Thruway Authority to Allocate Excess Highway Tolls to the Canal System

ATA contends that Congress did not evince an "unmistakably clear" intent to authorize the Thruway Authority to allocate excess revenues from highway tolls to the Canal System.[32] The Thruway

---

[29] J.A. 272.

[30] *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003).

[31] *Brown v. City of New York*, 862 F.3d 182, 187 (2d Cir. 2017).

[32] *See S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91 (1984).

Authority, on the other hand, argues that Congress did expressly authorize it to do so. We agree with the Thruway Authority.

The Commerce Clause gives Congress the power "to regulate Commerce . . . among the several states."[33] The Supreme Court has long recognized that the Commerce Clause "also limits the power of the States to erect barriers against interstate trade"—the so-called Dormant Commerce Clause.[34] Under the Dormant Commerce Clause, a highway toll is constitutional only if it is "based on some fair approximation of use or privilege for use . . . and is neither discriminatory against interstate commerce nor excessive in comparison with the governmental benefit conferred."[35]

The Supreme Court has also recognized, however, that "[w]here state or local government action is specifically authorized by Congress, it is not subject to the [Dormant] Commerce Clause even if it interferes with interstate commerce."[36] In issuing such an authorization, "Congress must manifest its unambiguous intent."[37] Put another way, "Congress' intent and policy to sustain state legislation from attack under the Commerce Clause [must be]

---

[33] U.S. CONST. art. I, § 8, cl. 3.

[34] *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 35 (1980).

[35] *Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 716-17 (1972); *see also Nw. Airlines, Inc. v. Cty. of Kent, Mich.*, 510 U.S. 355, 362-63 (1994).

[36] *White v. Mass. Council of Constr. Emp'rs, Inc.* 460 U.S. 204, 213 (1983).

[37] *Wyoming v. Oklahoma*, 502 U.S. 437, 458 (1992).

'expressly stated.'"[38] That said, "[t]here is no talismanic significance to the phrase 'expressly stated,'" which "merely states one way of meeting the requirement that for a state regulation to be removed from the reach of the [D]ormant Commerce Clause, congressional intent must be *unmistakably clear*."[39] In other words, Congress need not expressly state that it is authorizing a state to engage in activity that would otherwise violate the Dormant Commerce Clause; it need only clearly allow the state to engage in such activity.

The plain language of ISTEA manifestly contains such "unmistakably clear" evidence of an intent to authorize the Thruway Authority to use excess highway toll revenues for canal purposes.

ISTEA section 1012 permitted the Thruway Authority to allocate excess toll revenues (1) to any transportation facilities under the Thruway Authority's jurisdiction or (2) for any project eligible to receive federal assistance under Title 23.[40] The Canal System meets both conditions. On the first score, the New York State Legislature in 1992 transferred jurisdiction of the Canal System to the Thruway Authority, which maintained jurisdiction at all times relevant to this appeal. And on the second score, as part of ISTEA, Congress modified Title 23 to define canals as eligible for federal assistance. ATA acknowledges this fact—thereby conceding that Congress plainly

---

[38] *Sporhase v. Nebraska, ex rel. Douglas*, 458 U.S. 941, 960 (1982).

[39] *S.-Cent. Timber Dev.*, 467 U.S. at 91 (emphasis added).

[40] 23 U.S.C. § 101(a); ISTEA § 1012(e), § 1007(a)-(c).

authorized the Thruway Authority to use *at least some* excess highway toll revenues for canal purposes.[41]

Having (quietly) made this concession, ATA is left to argue that, while Congress authorized the Thruway Authority to devote *some* excess toll revenue to the Canal System, it still meant to limit the *amount* of such allocations. Read in context, ATA contends, section 1012(e) is best understood to lift the prior statutory limit on state tolls, permitting the Thruway Authority merely to continue tolling regimes as they existed at the time of ISTEA's enactment.

To support its interpretation, ATA points to phrases in the statute, such as "allow for the *continuance* of tolls."[42] The ordinary meaning of "continuance," according to ATA, is "[t]o remain in the same state."[43] And its use thus indicates that Congress expected any post-ISTEA tolls to be substantially similar in nature and purpose. Since the tolls that Congress permitted to continue in 1992 were

---

[41] Pls. Br. at 18 n.4 ("The district court concluded that the Canal System was a project eligible for assistance under Title 23 . . . , a determination that is not at issue in this appeal."). It is true that "[w]e do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review." *United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993). Here, however, ATA makes an admission, not an argument. And ATA concedes this point again in its main brief. Pls. Br. at 33-34 (noting that the second sentence of ISTEA section 1012(e) provides that revenues collected from tolls in excess of those needed for debt service and operation and maintenance can be used for "specified purposes (including various transportation-related projects and facilities, among them the canals)").

[42] Pls. Br. at 33-34 (quoting ISTEA section 1012(e)) (emphasis in original).

[43] *Id.* at 34 (quoting Webster's II New Riverside University Dictionary 305 (1984)).

calculated to pay for highway maintenance, they could not have been used to fund unrelated projects at any substantial level.

In our view, there is no basis to interpret the word "continuance" as freezing in place the tolling regime at the time of ISTEA's enactment. Instead, a plain reading of the statute reveals that Congress meant to permit the Thruway Authority to continue collecting tolls of whatever amount *without having to repay federal funds*—something that it was previously barred from doing once it satisfied its debt obligations. If and when the Thruway Authority did so, it would have surplus revenue on hand to devote to other transportation projects, an outcome that ISTEA not only contemplated but expressly sanctioned.

Here, too, ATA makes a critical admission. It acknowledges that the District Court's conclusion that "nothing in ISTEA caps the amount of excess toll revenue that can be used to support transportation enhancement activities," such as canals, is "perhaps true as a literal matter."[44] Inasmuch as ATA concedes that Congress authorized the Thruway Authority to allocate excess toll revenues for canal purposes, and likewise concedes that it is "true as a literal matter" that ISTEA contains no language limiting the amount of

---

[44] *Am. Trucking Ass'ns.*, 238 F. Supp. 3d at 536; Pls. Br. at 39-40.

revenue for allocation, its argument necessarily relies merely on context, not text.[45]

---

[45] But if anything, the *context* militates in favor of recognizing that Congress intended to authorize the Thruway Authority to devote excess highway toll revenue to the Canal System.

 Senator Moynihan, who, as noted above, was the mastermind of ISTEA, sought as a general matter to devolve transportation policy to states and cities. *Ante*, note 17. As *The New York Times* put it, the bill gave states "freedom in how they spend Federal transportation money," for the first time allowing them "to choose the projects they think they most need rather than hav[ing] to follow a Federal model." Richard L. Berke, *Senate Approves Bill to Overhaul Transportation*, N.Y. TIMES, June 20, 1991, https://www.nytimes.com/1991/06/20/us/senate-approves-bill-to-overhaul-transportation.html. To achieve that goal, Senator Moynihan proposed that highway money be "fungible," such that states could use funds on other modes of transportation, such as mass transit. *See* Weingroff, *ante* note 17. It is worth noting that ATA opposed the measure for precisely this reason, fearing that by permitting states to devote resources to other transportation projects, the bill would "threaten[] the future of America's highways." *Id.*

 More specifically, Senator Moynihan pressed from the beginning for language specific to New York that would permit the state to maintain tolls as a source of revenue, declaring that he would "be responsible" for coordinating the bill's passage. *Tolls on Thruway May Not Disappear, State Will Keep Fees and U.S. Aid if Congress Passes Pending Bill*, BUFFALO NEWS, Feb. 22, 1991, at A1, *available at* 1991 WLNR 956953. As the drafting process began, he conducted several Field Hearings in which he urged the Commissioner of the New York State Department of Transportation not to "forget that canal system," and called the Canal System "just a treasure." *Field Hearings*, *ante* note 17, at 304; J.A. 209. Moynihan's interest in finding financing for the Canal System is hardly surprising; he was widely known as a "longtime aficionado of the canal and its lore." Joseph Berger, *U.S. Allots $120 Million for Banks of Erie Canal*, N.Y. TIMES, Nov. 26, 1996, http://www.nytimes.com/1996/11/26/nyregion/us-allots-120-million-for-banks-of-erie-canal.html.

The text is clear: Congress manifested its unambiguous intent to authorize the Thruway Authority to allocate excess toll funds to the Canal System. Although ISTEA does not expressly invoke the Commerce Clause or state its intent to abrogate Dormant Commerce Clause limitations, it need not do so if congressional intent is unmistakable—as it is here.

**C. Whether the Thruway Authority Forfeited Its Argument That Congress Authorized It to Depart from the Commerce Clause**

We next address whether the Thruway Authority forfeited its argument that Congress authorized it to allocate excess highway toll revenues to the Canal System.[46]

---

Later, when the bill that would become ISTEA emerged from the Senate Committee on Environment and Public Works without any New York-specific language, Senator Moynihan proposed an amendment, which would eventually become section 1012(e). The amendment allowed the state agencies in charge of the New York State Thruway and the Fort McHenry Tunnel in Maryland to use excess highway toll revenues to cover transportation facilities under Title 23, as well as those "under the jurisdiction" of those agencies. 137 Cong. Rec. 14774, 14883 (June 13, 1991). In introducing the amendment, Senator Moynihan highlighted how Maryland could allocate tolls raised from the Fort McHenry Tunnel. He explained that section 1012(e) was designed to "make possible the movement of toll receipts on and off the particular systems in such a way that the State, in this case Maryland, can optimize its transportation choices and provision thereof." *Id.* at 14774. "We very much want Maryland to do with Maryland money what Maryland thinks is best." *Id.*

[46] The forfeiture question applies only in *ATA*, not in *ABA*. The plaintiffs in *ABA* filed suit only in February 2017, after the Thruway Authority had discovered its congressional-authorization defense. In *ATA*, however—originally filed in 2013—the Thruway Authority failed to raise that defense for over three years.

ATA argues that the Thruway Authority failed to raise its argument regarding congressional authorization for more than three years after ATA filed its complaint and for almost six months after the District Court granted partial summary judgment on liability in favor of ATA. That failure, according to ATA, constitutes forfeiture.

Yet ATA concedes that, regardless of whether the Thruway Authority indeed forfeited its argument, the District Court had discretion to reach the merits to correct a clear error.[47] As we have explained, Congress's intent in ISTEA section 1012(e) to exempt the Thruway Authority from the Dormant Commerce Clause was unmistakably clear. Thus, regardless of whether the District Court relied on the proper standard for forfeiture, it had discretion to reach the merits of the Thruway Authority's defense.[48]

---

[47] Pls. Br. at 56.

[48] ATA argues that the District Court applied an erroneous legal standard by reasoning that because the Thruway Authority did not know of its defense previously, it could not have waived or forfeited it. *Id.* That standard, according to ATA, does not apply to waivers or forfeitures of legal *arguments*, and, instead, the District Court should have asked whether "'the need to correct a clear error or prevent manifest injustice' justified considering defendants' belated argument," *Id.* at 57 (quoting *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013)). Since the District Court had discretion to reach the merits, we need not reach the question of whether it applied the proper legal standard.

### III. CONCLUSION

In summary, we hold as follows:

(1) Congress evinced an "unmistakably clear" intent to authorize the Thruway Authority to depart from the strictures of the Dormant Commerce Clause by allocating surplus highway toll revenues to New York's Canal System;

(2) Congress placed no limits on the amount of such surplus highway toll revenue that the Thruway Authority could allocate to the Canal System;

(3) The District Court correctly granted defendants' motion to dismiss on the basis of Congressional authorization and vacated its previous order granting plaintiffs' motion for partial summary judgment; and

(4) The District Court had discretion to reach the merits of the Thruway Authority's defense that Congress had authorized it to devote surplus highway toll revenues to the Canal System.

For the foregoing reasons, we **AFFIRM** the judgment of the District Court.