**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1775
_____

OWNER OPERATOR INDEPENDENT DRIVERS
ASSOCIATION, INC.; NATIONAL MOTORIST
ASSOCIATION; MARION L. SPRAY; B.L. REEVER
TRANSPORT, INC.; FLAT ROCK TRANSPORTATION,
LLC; MILLIGAN TRUCKING, INC.*; FRANK SCAVO;
LAURENCE G. TARR,

> Appellants

v.

PENNSYLVANIA TURNPIKE COMMISSION; LESLIE S.
RICHARDS, in her individual capacity and her official
capacities as Chair of the PTC and Secretary of the
Department of Transportation; WILLIAM K. LIEBERMAN,
in his individual capacity and his official capacity as Vice
Chair of the PTC; BARRY T. DREW, in his individual
capacity and his official capacity as Secretary-Treasurer of
the PTC; PASQUALE T. DEON, SR., in his individual
capacity and his official capacity as Commissioner of the
PTC; JOHN N. WOZNIAK, in his individual capacity and his
official capacity as Commissioner of the PTC; MARK P.
COMPTON, in his individual capacity and his official
capacity as Chief Executive Officer of the PTC; CRAIG R.
SHUEY, in his individual capacity and his official capacity as

Chief Operating Officer of the PTC; TOM WOLF, Governor
of the Commonwealth of Pennsylvania, in his individual
capacity and his official capacity as Governor

*(Amended as per the Clerk's 04/25/19 Order)
_____

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1-18-cv-00608)
District Judge: Hon. Yvette Kane
_____

Argued July 9, 2019
_____

Before: SHWARTZ, KRAUSE, and FUENTES, <u>Circuit
Judges</u>.

(Filed: August 13, 2019)

Melissa A. Chapaska
Kevin J. McKeon
Dennis Whitaker
Hawke McKeon & Sniscak
100 North Tenth Street
P.O. Box 1778
Harrisburg, PA 17101

Paul D. Cullen, Jr.
Paul D. Cullen, Sr. [ARGUED]
Kathleen B. Havener
The Cullen Law Firm

1101 30th Street, N.W.
Suite 300
Washington, DC 20007

*Counsel for Appellants Owner Operator
Independent Drivers Association, Inc., National
Motorist Association, Marion L. Spray, B.L.
Reever Transport Inc., Flat Rock
Transportation LLC, Milligan Trucking Inc.,
Frank Scavo, and Laurence G. Tarr*

Robert L. Byer [ARGUED]
Leah A. Mintz
Lawrence H. Pockers
Brian J. Slipakoff
Duane Morris
30 South 17th Street
United Plaza
Philadelphia, PA 19103

*Counsel for Appellees Pennsylvania Turnpike
Commission; Leslie S. Richards, in her
individual capacity and her official capacities
as Chair of the PTC and Secretary of the
Department of Transportation; William K.
Lieberman, in his individual capacity and his
official capacity as Vice Chair of the PTC;
Barry Drew, in his individual capacity and his
official capacity as Secretary-Treasurer of the
PTC; Pasquale T. Deon, Sr., in his individual
capacity and his official capacity as
Commissioner of the PTC; John N. Wozniak, in
his individual capacity and his official capacity*

*as Commissioner of the PTC; Mark P.
Compton, in his individual capacity and his
official capacity as Chief Executive Officer of
the PTC; and Craig R. Shuey, in his individual
capacity and his official capacity as Chief
Operating Officer of the PTC*

Arleigh P. Helfer, III
Bruce P. Merenstein [ARGUED]
Schnader Harrison Segal & Lewis
1600 Market Street
Suite 3600
Philadelphia, PA 19103

*Counsel for Appellees Leslie S. Richards, in her
individual capacity and her official capacities
as Chair of the PTC and Secretary of the
Department of Transportation, and Tom Wolf,
Governor of the Commonwealth of
Pennsylvania, in his individual capacity and his
official capacity as Governor*

Alex M. Lacey
Robert M. Linn
Robyn A. Shelton
Cohen & Grigsby
625 Liberty Avenue
5th Floor
Pittsburgh, PA 15222

*Counsel for Appellee William K. Lieberman, in
his individual capacity and his official capacity
as Vice Chair of the PTC*

4

Matthew H. Haverstick
Shohin H. Vance
Kleinbard
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103

       *Counsel for Appellee Craig R. Shuey, in his*
       *individual capacity and his official capacity as*
       *Chief Operating Officer of the PTC*

Thomas M. Fisher
Office of Attorney General of Indiana
302 West Washington Street
Indianapolis, IN 46204

       *Counsel for Amicus Curiae the State of Indiana*

Miguel A. Estrada
Gibson Dunn & Crutcher
1050 Connecticut Avenue, N.W.
Washington, DC 20036

       *Counsel for Amicus Curiae ITR Concession*
       *Company LLC*

_____

OPINION
_____

SHWARTZ, <u>Circuit Judge</u>.

Plaintiffs are individuals and members of groups who pay tolls to travel on the Pennsylvania Turnpike.[1] They allege that Pennsylvania state entities and officials ("Defendants") have violated the dormant Commerce Clause and their right to travel.[2] Specifically, Plaintiffs assert that Defendants have set exorbitantly high tolls for use of the Pennsylvania Turnpike and that the amounts collected exceed the costs to operate the Turnpike. They contend the extra funds are being used for projects that disproportionately benefit local interests and that the high tolls deter non-Pennsylvanians from using the Turnpike.

Because Congress has permitted state authorities, such as Defendants, to use the tolls for non-Turnpike purposes, the collection and use of the tolls do not implicate the Commerce Clause. Moreover, because Plaintiffs have not alleged that their right to travel to, from, and within Pennsylvania has been deterred, their right to travel has not been infringed. Therefore,

---

[1] Plaintiffs are Owner Operator Independent Drivers Association, Inc.; National Motorist Association; Marion L. Spray; B.L. Reever Transport, Inc.; Flat Rock Transportation, LLC; Milligan Trucking, Inc.; Frank Scavo; and Laurence G. Tarr.

[2] Defendants are the Pennsylvania Turnpike Commission ("PTC"), William K. Lieberman, Vice Chair of the PTC; Barry Drew, Secretary-Treasurer of the PTC; Pasquale T. Deon, Sr., and John N. Wozniak, Commissioners of the PTC; Mark P. Compton, Chief Executive Officer of the PTC; Craig R. Shuey, Chief Operating Officer of the PTC; Pennsylvania Governor Tom Wolf; and Leslie S. Richards, who is both the Chair of the PTC and Secretary of the Pennsylvania Department of Transportation.

we will affirm the District Court's order dismissing the complaint.

I

A

The Pennsylvania Turnpike is part of a 552-mile highway system that crosses Pennsylvania from New Jersey to Ohio. The Pennsylvania Turnpike Commission ("PTC") sets and collects Turnpike tolls.

In 2007, the Pennsylvania legislature enacted Act 44, which, among other things, permitted the PTC to increase tolls and required the PTC to make annual payments for a fifty-year period to the Pennsylvania Department of Transportation ("PennDOT") Trust Fund. See 75 Pa. Cons. Stat. § 8915.3. In 2013, Act 89 amended Act 44, as amended "Act 44/89." Act 89 continued to permit toll increases but lowered the annual payments to the PennDOT Trust Fund.

After Act 44 went into effect, the PTC announced a 25% toll increase and from 2009 through 2016, tolls were increased annually by more than 10% for cash customers and 5.75% for customers using an electronic toll transmitter known as an EZ-Pass. Plaintiffs assert that since the enactment of Act 44, tolls have increased more than 200% and that the current cost for the heaviest vehicles to cross the 359-mile portion of the Pennsylvania Turnpike that spans from New Jersey to Ohio exceeds $1800. Pennsylvania's Auditor General found that PTC's annual "costly toll increases place an undue burden" on Pennsylvanians, opined that "the average turnpike traveler will be deterred by the increased cost and seek alternative toll-free

7

routes," App. 88 (emphasis omitted) (quoting September 2016 Performance Audit of the PTC), and recommended that the PTC seek legislative relief from its Act 44/89 payment obligations.

Tolls are PTC's largest revenue source and amount to 166-215% of the costs to maintain and operate the Turnpike. Simply put, the amount of the tolls collected exceeds the amount it costs to run the Turnpike. The excess tolls are deposited into the PennDOT Trust Fund, which are, in turn, transferred to four different programs: (1) operating programs under 74 Pa. Cons. Stat. § 1513, which include asset maintenance costs and expenses for public passenger transport; (2) the multimodal transportation fund under 74 Pa. Cons. Stat. § 2104, which covers aviation, freight and passenger rail, and port and waterway projects; (3) the asset improvement program under 74 Pa. Cons. Stat. § 1514 for financial assistance for the improvement, replacement, or expansion of capital projects; and (4) programs of statewide significance under 74 Pa. Cons. Stat. § 1516, which include disability programs, rail and bus services, community transportation, Welfare-to-Work programs, and research projects. Act 44/89 is designed to generate $450 million annually for PennDOT from 2011 through 2022.[3] More than ninety percent of Act 44/89 payments—approximately $425 million annually—benefit "non-Turnpike road and bridge projects and transit operations." App. 78. Plaintiffs allege that many of these "programs have no functional relationship to the Pennsylvania Turnpike," including, for instance, the "[c]onstruction of an

---

[3] Act 44/89 payments will generate $50 million annually for PennDOT from 2023 through 2057.

underpass" and a "[s]idewalk installation."[4]   App. 81-82. Plaintiffs concede that a federal statute, the Intermodal Surface

---

[4] Plaintiffs allege that Act 44/89 funds have been used for various programs across the state including:

> a. Development of Three Crossings, a mixed-use development consisting of residential units, office space, and a transportation facility with vehicle and bicycle parking, bicycle repair, electric-vehicle charging stations, kayak storage, and transit station in Pittsburgh (Allegheny County);
>
> b.  Construction of an underpass under U.S. 22, connecting the Lower Trail with Canoe Creek State Park (Blair County);
>
> c. Rehabilitation of nine stone-arch bridges along the SEPTA regional railway line (Regional project);
>
> d.  Replacement of the roof at Collier Bus Garage (Allegheny County);
>
> e.  Sidewalk installation along North Main Street in Yardley (Bucks County);
>
> f.   Installation of approximately 1,800 feet of ADA-compliant sidewalk along the south side of Union Deposit Road between Shield Street and Powers Avenue at the Union Square Shopping Center in Susquehanna (Dauphin County);

g. Extension of internal road, including final design, survey, permit modifications, bid documents, construction, storm water, street lights, project administration, legal expenses, audit expenses, and contingencies in Windy Ridge Business and Technology Park (Indiana County);

h. Improvements to roadways in 12,000 acres of parks, including widening shoulders, paving, signage installation, and bicycle marking in the Allegheny County Parks;

i. Addition of eight curb ramps, new asphalt, four decorative crosswalks and a surface sign at an intersection in Latrobe (Westmoreland County);

j. Phase II Construction of Erie Metropolitan Transportation Authority's Maintenance and Paratransit Bus Storage Facility (Erie County);

k. Improvements to the Erie International Airport terminal building (Erie County);

l. Creation of a multi-use trail and installing associated signage from the West End neighborhood linking existing bike routes to a multiuse path that connects to The Pennsylvania State University (Centre County);

10

Transportation Efficiency Act of 1991 ("ISTEA"), Pub. L. No. 102-240, 105 Stat. 1914 (codified as amended in scattered titles), authorizes these types of projects. Nonetheless, they assert that the toll costs burden interstate commerce and "discourag[e] both business and private travelers from using the Turnpike." App. 99.

---

m. Creation of a pedestrian island at the intersection of Park Avenue and McKee Street in State College to provide a safer crossing for pedestrians and cyclists and accommodate the accessibility needs of vision-impaired residents (Centre County);

n. Construction of a new two-way industrial access road, realigning a portion of the Nittany & Bald Eagle Railroad Main Line to accommodate the access road, and constructing new sidings and operating tracks for First Quality Tissue's two existing facilities and a proposed new facility (Clinton County);

o. Construction of an 85-car unit train loop track in the Keystone Regional Industrial Park to connect with an existing Norfolk Southern main line track and serve a Deerfield Farms Service grain elevator facility in Greenwood (Crawford County).

App. 81-84.

B

Plaintiffs brought suit on behalf of a putative class alleging violations of the dormant Commerce Clause and their right to travel.[5] Defendants moved to dismiss and Plaintiffs moved for partial summary judgment on the issue of liability.

The District Court granted Defendants' motions to dismiss[6] and denied Plaintiffs' motion for summary judgment. See generally Owner Operator Indep. Drivers Ass'n v. Pa. Tpk. Comm'n, No. 1:18-cv-00608, -- F. Supp. 3d --, 2019 WL

---

[5] The Complaint seeks (1) a declaratory judgment that PTC's tolls and the provisions of Act 44/89 that direct the PTC to make payments to PennDOT violate the dormant Commerce Clause and the constitutional right to travel, (2) a preliminary and permanent injunction enjoining both the excess tolls and payments under Act 44/89, and (3) a judgment against Defendants ordering the refund of excess toll payments.

[6] Certain Defendants also moved in the alternative for summary judgment. Although the District Court outlined the legal standards for both Federal Rules of Civil Procedure 12(b)(6) and 56, Owner Operator Indep. Drivers Ass'n v. Pa. Tpk. Comm'n, No. 1:18-cv-00608, -- F. Supp. 3d --, 2019 WL 1493182, at *8-9 (M.D. Pa. Apr. 4, 2019), and, at the outset of its dormant Commerce Clause analysis, referenced "undisputed" facts, id. at *18, it applied the Rule 12(b)(6) standard, concluding that Plaintiffs' "factual allegations do not support a claim for violations of the dormant Commerce Clause or the constitutional right to travel," and granting "the PTC Defendants' and Commonwealth Defendants' motions to dismiss," id. at *24. We therefore review the District Court's opinion granting a motion to dismiss. See infra note 7.

1493182 (M.D. Pa. Apr. 4, 2019). The Court applied the test set forth in Pike v. Bruce Church, Inc., 397 U.S. 137 (1970), and held that, because the alleged burdens from the tolls are equally imposed on both in- and out-of-state drivers, they are general burdens on commerce that do not violate the dormant Commerce Clause, Owner Operator, 2019 WL 1493182, at *22. The Court also held that Plaintiffs failed to state a claim that their right to interstate travel was infringed because they asserted only that the toll structure deterred Turnpike travel. Id. at *24.

## II[7]

## A

## 1

The Commerce Clause confers upon Congress the

---

[7] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. We have jurisdiction under 28 U.S.C. § 1291.

Our review of the District Court's dismissal of Plaintiffs' complaint is plenary. Burtch v. Milberg Factors, Inc., 662 F.3d 212, 220 (3d Cir. 2011). To withstand a motion to dismiss, a complaint must allege a claim "that is plausible on its face" when accepting all the factual allegations as true and drawing every reasonable inference in favor of the nonmoving party. Connelly v. Lane Constr. Corp., 809 F.3d 780, 786 & n.2 (3d Cir. 2016) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). In reviewing a complaint, we disregard conclusory assertions and bare recitations of the elements. Id. at 786 n.2.

power "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. By negative implication, Congress's authority to regulate commerce prohibits the states from enacting "laws that unduly restrict interstate commerce." Tenn. Wine & Spirits Retailers Ass'n v. Thomas, 139 S. Ct. 2449, 2459 (2019). This "dormant Commerce Clause" bars states from discriminating against or unduly burdening interstate commerce, for instance by enacting protectionist regulations that give in-state businesses an advantage over out-of-state businesses, see, e.g., Pike, 397 U.S. at 144-45, or by assessing fees that "threaten the free movement of commerce by placing a financial barrier around the [s]tate," Am. Trucking Ass'ns, Inc. v. Scheiner, 483 U.S. 266, 284 (1987).

Congress, however, may authorize a state to take actions that burden interstate commerce. S. Dakota v. Wayfair, Inc., 138 S. Ct. 2080, 2089 (2018). "[W]hen Congress exercises its power to regulate commerce by enacting legislation, the legislation controls." Id. Thus, where Congress has spoken and state or local governments take actions that are "specifically authorized by Congress," those actions are "not subject to the Commerce Clause even if [they] interfere[] with interstate commerce." [8] White v. Mass. Council of Constr. Emp'rs, Inc., 460 U.S. 204, 213 (1983) (citation omitted). In short, as applied here, if Congress authorizes an action, such as using tolls for non-toll road purposes, then "no dormant Commerce Clause issue is presented." Id.

---

[8] Absent such legislation, "Congress has left it to the courts to formulate the rules to preserve the free flow of interstate commerce." Wayfair, 138 S. Ct. at 2090 (internal quotation marks and citations omitted).

To determine whether Congress has authorized such action and thereby "removed [it] from the reach of the dormant Commerce Clause," we must consider whether its intent is "unmistakably clear." S.-Cent. Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 91 (1984); see Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys., 472 U.S. 159, 174 (1985) ("When Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack under the Commerce Clause."). While "congressional intent and policy to insulate state legislation from Commerce Clause attack [must be] 'expressly stated,'" "[t]here is no talismanic significance to the phrase 'expressly stated.'" S.-Cent. Timber, 467 U.S. at 90-91. "'Expressly stated' . . . merely states one way of meeting the requirement that for a state regulation to be removed from the reach of the dormant Commerce Clause, congressional intent must be unmistakably clear." Id. at 91. That is, Congress "need not expressly state that it is authorizing a state to engage in activity that would otherwise violate the [d]ormant Commerce Clause." Am. Trucking Ass'ns, Inc. v. N.Y. State Thruway Auth., 886 F.3d 238, 245 (2d Cir. 2018). Rather, Congress "need only clearly allow the state to engage in such activity." Id.

2

Defendants contend that Congress, through ISTEA, specifically authorized states to enact legislation that allocates highway tolls for purposes unrelated to the toll road. If a state's actions fall within the scope of Congress's authorization, then the dormant Commerce Clause does not apply. We therefore

15

begin by analyzing whether ISTEA authorizes Defendants' conduct.[9]

Under ISTEA, "Congress sought to foster a National Intermodal Transportation System, consisting of all forms of transportation in a unified, interconnected manner." Am. Trucking, 886 F.3d at 242 (internal quotation marks omitted). Before ISTEA, "Congress enacted the Surface Transportation Assistance Act ('STAA')," which provided "federal financial support" for toll roads. Id. at 241. STAA required that for state public authorities maintaining highways "to receive federal financial aid," they "had to discontinue levying tolls once they had collected sufficient revenues to retire outstanding bonds" that funded the highways. Id. "If those authorities failed to make a toll road free once they had collected sufficient tolls to retire those bonds, STAA required them to repay the federal government for the financing it had provided them." Id. at 241-42. ISTEA, however, "freed states from their obligation under the STAA to repay the federal government should they continue to collect tolls after retiring outstanding debts, and granted them greater flexibility to operate toll facilities and use toll revenues for a variety of transportation projects." Id. at

---

[9] Principles of constitutional avoidance counsel us to first address whether a statutory ground resolves the case, and thereby renders unnecessary the need to answer the "constitutional question" here of whether the Defendants' toll collection and allocation place an undue burden on interstate commerce in violation of the dormant Commerce Clause. Slack v. McDaniel, 529 U.S. 473, 485 (2000) (quoting Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)).

16

242. To that end, ISTEA "broadened the list of purposes for which states could use federal funds." Id.

ISTEA regulates the use of "toll revenues" by "[a] public authority," such as the PTC,[10] and enumerates the categories for which toll revenues may be used. 23 U.S.C. § 129(a)(3)(A). ISTEA provides that the public authority "shall ensure that all toll revenues received from operation of the toll facility are used only for":

- debt service;

- "a reasonable return on investment of any private person financing the project";

- "any costs necessary" to improve, operate, and maintain the toll facility; and

- payments to private parties (where applicable) "if the toll facility is subject to a public-private partnership agreement."

Id. § 129(a)(3)(A)(i)-(iv). In addition, if "the public authority certifies annually that the tolled facility is being adequately maintained," ISTEA permits the public authority to use toll revenues for "any other purpose for which Federal funds may be obligated by a State under [title 23]." Id. § 129(a)(3)(A)(v). In short, ISTEA allows a public authority to use toll revenues for non-toll road projects.

---

[10] A "public authority" includes a state "instrumentality with authority to finance, build, operate or maintain toll . . . facilities." 23 U.S.C. § 101(a)(21).

17

Pursuant to title 23, federal funds "may be obligated" for several broad categories of items, id., and at least two statutory subsections authorize expenditures unrelated to the toll road itself. For example, ISTEA authorizes states to construct, among other things, "transit capital projects eligible for assistance under chapter 53 of title 49." Id. § 133(b)(1)(C). Subject to certain conditions, capital projects may include "walkways," "pedestrian and bicycle access to [] public transportation facilit[ies]," and the "construction, renovation, and improvement of intercity bus and intercity rail stations and terminals." 49 U.S.C. § 5302(3)(G)(v)(VI)-(VIII).

Title 23 also authorizes states to build "[a]ny type of project eligible under this section as in effect on the day before the date of enactment of the [Fixing America's Surface Transportation] Act, including projects described under [§] 101(a)(29) as in effect on such day." 23 U.S.C. § 133(b)(15). Before Congress enacted the Fixing America's Surface Transportation Act in 2015, § 101(a)(29) listed various projects under the phrase "[t]ransportation alternatives," including the

> [c]onstruction . . . of on-road and off-road trail facilities for pedestrians, bicyclists, and other nonmotorized forms of transportation, including sidewalks, bicycle infrastructure, pedestrian and bicycle signals . . . to achieve compliance with the Americans with Disabilities Act of 1990 (42 U.S.C. [§] 12101 et seq.).

23 U.S.C. § 101(a)(29)(A) (2012). "Transportation alternatives" also include the "[c]onstruction of turnouts, overlooks, and viewing areas." Id. § 101(a)(29)(D) (2012).

18

Through ISTEA, Congress expressed its "unmistakably clear" intent that the Defendants could use toll revenues for non-toll road projects. S.-Cent. Timber, 467 U.S. at 91. Congress's authorization that toll revenues be used for purposes other than maintaining and operating the toll road, and servicing its debt, necessarily envisions that a public authority can collect funds that exceed a toll road's costs before it can spend them. See 23 U.S.C. § 129(a)(3)(A)(v). Thus, ISTEA contemplated that tolls exceeding the amount needed to fund a toll road would be collected and spent on non-toll road projects.

Plaintiffs argue that Congress could not have contemplated that a state would increase its tolls by over 200% to fund non-toll road projects. Plaintiffs ignore the text of ISTEA. Nowhere in the statute, including § 129(a)(3)(A)(v), did Congress cap the amount of toll money a state could raise. See Am. Trucking, 886 F.3d at 246 (holding that "a plain reading of [ISTEA] reveals that Congress meant to permit [a public authority] to continue collecting tolls of whatever amount without having to repay federal funds—something that it was previously barred from doing once it satisfied its debt obligations" (emphasis omitted)). As we already noted, the fact that Congress allowed states to use toll money on non-toll road projects presupposes that funds exceeding the amount needed for the toll road would be collected.

Nor is there merit to Plaintiffs' argument that ISTEA speaks only to "use" of excess toll revenue, not to "collection" or "generation" of toll revenue. As a matter of common sense, however, Congress's authorization of "use" assumes there is toll revenue collected in the first place to be used, and contrary to Plaintiffs' suggestion that Congress was speaking only to "nickels and dimes" left over each year due to fluctuating Turnpike costs,

19

Oral Arg. Tr. at 18, 77, Congress identified a host of big-ticket items that excess tolls could be spent to construct, including "highways, bridges, tunnels, . . . ferry boats[,] and [ferry] terminal facilities." 23 U.S.C. § 133(b)(1). This further shows that ISTEA did not limit the amount of funds the PTC could collect and spend on non-Turnpike projects.

Plaintiffs concede that the non-Turnpike related projects listed in their complaint for which toll funds were used fall within ISTEA's scope, but contend that Defendants failed to satisfy one of ISTEA's conditions for using the toll funds for non-toll road purposes. As noted earlier, ISTEA requires that the public authority "certif[y] annually that the toll facility is being adequately maintained" before any excess funds may be used for non-toll road projects. 23 U.S.C. § 129(a)(3)(A)(v). Defendants conceded before the District Court that they did not submit the required annual certifications. Their failure to comply with this condition, however, does not diminish the fact that Congress has legislated in the area of interstate commerce at issue and blessed the use of tolls for non-toll road purposes.[11] In other words, the presence or absence of the

---

[11] Moreover, Plaintiffs' attempt to preclude Defendants from relying on § 129(a)(3)(A)(v)'s spending authority because they did not fulfill the statute's certification requirements also fails because the statute does not provide a private right of action. See Endsley v. City of Chicago, 230 F.3d 276, 280 (7th Cir. 2000). Not only is there no private right of action, but Congress specified its own remedy here for the failure to abide by this condition. That remedy is vested in the Secretary of Transportation, who "may require the public authority to discontinue collecting tolls" if she "concludes that a public authority has not complied with the limitations on the use of revenues described in [§ 129(a)(3)(A)]." 23 U.S.C.

20

annual certification does not otherwise affect Congress's "unambiguous intent to authorize [a state authority, such as the PTC,] to allocate excess toll funds" to non-toll road projects. Am. Trucking, 886 F.3d at 247.

In sum, "[t]he text is clear": Congress has authorized the states, including the Commonwealth of Pennsylvania, to generate and use such tolls to fund the type of projects listed in Plaintiffs' complaint.[12]  Id.  As a result, the collection and use of the tolls to fund the challenged expenditures does not violate the dormant Commerce Clause, and the District Court properly dismissed Plaintiffs' dormant Commerce Clause claim.[13]

---

§ 129(a)(3)(C).  As it is Congress's prerogative to authorize the use of funds at issue and it has done so, we need not adjudicate the consequence for the failure to certify.

[12] Because we hold that Congress has authorized Defendants to engage in the challenged activity, we need not decide whether Pike, 397 U.S. 137, or Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc., 405 U.S. 707 (1972), or some other test applies to a dormant Commerce Clause challenge to a toll.

[13] Although the District Court declined to decide whether "Congress has specifically authorized the expenditure of toll revenues contemplated by Act 44/89," Owner Operator, 2019 WL 1493182, at *22 n.23, we may affirm its order dismissing Plaintiffs' complaint "on any ground supported by the record," Tourscher v. McCullough, 184 F.3d 236, 240 (3d Cir. 1999).

B

Plaintiffs' claim that the tolls violate their right to travel also fails. "The constitutional right to travel from one State to another, and necessarily to use the highways and other instrumentalities of interstate commerce in doing so, occupies a position fundamental to the concept of our Federal Union." United States v. Guest, 383 U.S. 745, 757 (1966). We have observed that the right to travel includes "the right of a citizen of one State to enter and to leave another State," Connelly v. Steel Valley Sch. Dist., 706 F.3d 209, 213 (3d Cir. 2013), as amended (May 10, 2013) (quoting Saenz v. Roe, 526 U.S. 489, 500 (1999)), as well as a right to intrastate travel, see Lutz v. City of York, 899 F.2d 255, 268 (3d Cir. 1990), though the exact "contours" of that right remain elusive, see United States v. Baroni, 909 F.3d 550, 588 (3d Cir. 2018), cert. granted Kelly v. United States, No. 18-1059, 2019 WL 588845 (U.S. June 28, 2019).

To determine whether a state law "sufficiently impinges upon the right to travel or migrate to trigger strict scrutiny, [we look] to see whether the challenged law's [1] 'primary objective' is to impede interstate travel; [2] whether it 'penalize[s] the exercise of that right;' or [3] whether it 'actually deters such travel.'" Maldonado v. Houstoun, 157 F.3d 179, 186 (3d Cir. 1998) (fourth alteration in original) (quoting Att'y Gen. of N.Y. v. Soto-Lopez, 476 U.S. 898, 903 (1986) (plurality opinion)).

Plaintiffs do not assert that the toll penalizes or impedes travel. Rather, Plaintiffs allege that "the average turnpike traveler will be deterred by the increased cost and seek alternative toll-free routes[,]" App. 88 (quotation marks and

22

citation omitted), and that the tolls "discourag[e] both business and private travelers from using the Turnpike," App. 99. Thus, we must decide whether Plaintiffs have stated a claim that the tolls "actually deter[]" interstate or intrastate travel. Soto-Lopez, 476 U.S. at 903.

"[B]urdens on a single mode of transportation do not implicate the right to interstate travel."[14] Miller v. Reed, 176 F.3d 1202, 1205 (9th Cir. 1999). Moreover, "[b]urdens placed on travel generally, such as gasoline taxes, or minor burdens impacting interstate travel, such as toll roads, do not constitute a violation of" the right to travel. Id. Put differently, "[m]inor restrictions on travel," including delays and costs, "simply do not amount to the denial of a fundamental right that can be upheld only if the Government has a compelling justification." Cramer v. Skinner, 931 F.2d 1020, 1031 (5th Cir. 1991); see also Lutz, 899 F.2d at 269 ("[T]he right to travel cannot conceivably imply the right to travel whenever, wherever and however one pleases—even on roads specifically designed for public travel."). "A law does not actually deter travel merely because it makes it somewhat less attractive for a person to travel interstate," Pollack v. Duff, 793 F.3d 34, 46 (D.C. Cir. 2015) (internal quotation marks omitted), or it is not "the most convenient form of travel," Town of Southold v. Town of E. Hampton, 477 F.3d 38, 54 (2d Cir. 2007) (internal quotation marks omitted); see Kansas v. United States, 16 F.3d 436, 442 (D.C. Cir. 1994) (holding that law channeling interstate air

---

[14] States may not impose burdens on all modes of interstate travel. See Crandall v. Nevada, 73 U.S. 35, 39-40, 46 (1867) (holding unconstitutional a state tax imposed on all persons exiting the state or passing through its borders).

travel through new airport requiring a longer drive had at most "negligible" or "trivial" effect on right to travel).

Because Plaintiffs allege only that the increased tolls have caused and will continue to cause Turnpike users to switch to non-toll roads in the future,[15] and not that interstate or intrastate travel has been or will be deterred,[16] they have not stated a claim that their right to travel has been infringed. Therefore, the District Court properly dismissed Plaintiffs' right to travel claim.

III

For the foregoing reasons, we will affirm.

---

[15] In Wallach v. Brezenoff, we applied Evansville to evaluate plaintiffs' assertion that an increase in tolls on all of the bridges and tunnels from New Jersey to New York City violated their right to travel. 930 F.2d 1070, 1072 (3d Cir. 1991). The Evansville Court observed that "facilit[ies] provided at public expense [such as highways] aid[] rather than hinder[] the right to travel," and therefore requiring users to "pay a reasonable fee" is constitutional. 405 U.S. at 714. We need not engage in such analysis or determine, as Plaintiffs urge us to do, whether Evansville supplies the exclusive test of constitutionality for certain right to travel claims because Plaintiffs here acknowledge that there are non-toll routes to travel in and out of Pennsylvania.

[16] Plaintiffs seek to rely on Defendant Wolf's statements on the radio that the tolls deter travel on the Turnpike, but those statements are outside of the pleadings and thus are irrelevant to whether the complaint states a claim.