24-384-cv
*Variscite NY Four, LLC v. New York State Cannabis Control Board*

# United States Court of Appeals
# for the Second Circuit

AUGUST TERM 2024
No. 24-384-cv

VARISCITE NY FOUR, LLC, VARISCITE NY FIVE, LLC,
*Plaintiffs-Appellants*,

*v.*

NEW YORK STATE CANNABIS CONTROL BOARD, NEW YORK STATE
OFFICE OF CANNABIS MANAGEMENT, TREMAINE WRIGHT, FELICIA
REID, FKA CHRISTOPHER ALEXANDER,
*Defendants-Appellees*.

ARGUED: DECEMBER 19, 2024
DECIDED: AUGUST 12, 2025

Before:     LIVINGSTON, Chief Judge, JACOBS, and
CALABRESI, Circuit Judges.

Plaintiffs-Appellants sought licenses to operate marijuana dispensaries in New York, and challenge the state's licensure procedure as violative of the dormant Commerce Clause. Under the challenged laws, applicants for dispensary licenses have superior

odds of obtaining a license if they (or their close relatives) have a conviction for a marijuana-related offense under New York law.

The U.S. District Court for the Northern District of New York (Narducci, *J.*) denied preliminary relief on the ground that the dormant Commerce Clause does not apply to markets that Congress has criminalized.

New York argues that its scheme does not violate the dormant Commerce Clause because its purpose is restorative justice, not economic protectionism; that in any event, the Clause does not bear upon its licensure scheme because marijuana is a federally illegal drug, *see* 21 U.S.C. § 812(c)(Schedule I)(c)(10); and that Plaintiffs-Appellants have no justiciable challenge.

We hold that Plaintiffs-Appellants have standing to challenge certain of New York's licensing practices under the dormant Commerce Clause, and that their suit is ripe; that the dormant Commerce Clause applies and Congress has given New York no clear permission to enforce protectionist marijuana licensing laws; and that

2

New York's prioritization of applicants with convictions under New York law is a protectionist measure that cannot stand.

**VACATED** and **REMANDED**.

Chief Judge Livingston dissents in part in a separate opinion.

> JEFFREY M. JENSEN, Jeffrey M. Jensen, PC, Beverly Hills, CA, *for Plaintiffs-Appellants*.
>
> ALEXANDRIA TWINEM (Barbara D. Underwood and Jeffrey W. Lang, *on the brief*), for Letitia James, Attorney General of the State of New York, Albany, NY, *for Defendants-Appellees*.

DENNIS JACOBS, *Circuit Judge*:

The plaintiffs, LLCs that are majority-owned by California residents, have applied for licenses to operate marijuana dispensaries in New York. They challenge the state's licensure procedure as violative of the dormant Commerce Clause. The state argues that this case is nonjusticiable, and that the plaintiffs' challenge fails on the merits.

New York law provides that any person may apply "for a license to cultivate, process, distribute, deliver or dispense" marijuana in New York "for sale." However, the line is long, and New York gives special priority to anyone who:

(a) is a member of a community disproportionately impacted by the enforcement of cannabis prohibition;

(b) has an income lower than eighty percent of the median income of the county in which the applicant resides; *and*

(c) was convicted of a marihuana-related offense prior to [March 31, 2021], or had a parent, guardian, child, spouse, or dependent, or was a dependent of an individual who, prior to

4

[March 31, 2021], was convicted of a marihuana-related offense."

NY Canbs. § 87(3) (emphasis added). The third requirement is implemented by a regulation that defines a "marihuana-related offense" as one arising under *New York's* former marijuana prohibitions. That is, to qualify for priority review, applicants (or their close relatives) must have a conviction *under New York law*, specifically. All other offenders end up at the back of the line.

New York argues (in summary): [1] that its scheme does not violate the dormant Commerce Clause because its purpose is restorative justice, not economic protectionism; [2] that in any event, the Clause does not bear upon its licensure scheme because marijuana is a federally illegal drug, *see* 21 U.S.C. § 812(c)(Schedule I)(c)(10); and [3] that these plaintiffs' have no justiciable challenge.

The U.S. District Court for the Northern District of New York (Narducci, *J.*) denied preliminary relief on the ground that the dormant Commerce Clause does not apply to markets that Congress has criminalized.

5

That was error. The dormant Commerce Clause prohibits state protectionism unless Congress clearly authorizes specific protectionist laws. The only thing Congress has clearly authorized by criminalizing marijuana is federal prosecution for the manufacture, distribution, and possession of marijuana. Congress has given New York no clear permission to favor its residents over others whose businesses skirt the federal drug laws. Under traditional dormant Commerce Clause principles, New York's prioritization of applicants with convictions under New York law is a protectionist measure that cannot stand. Since the district court premised its denial of preliminary relief on its conclusion that New York's marijuana laws could not violate the dormant Commerce Clause, we vacate and remand.

**I.**

New York is one of the many states that have recently "legalized adult use of marijuana" under their state law. *United States v. Francis*, 77 F.4th 66, 73 (2d Cir. 2023). New York's Marijuana Regulation & Taxation Act ("Cannabis Law"), enacted in 2021,

"legalize[d] adult use cannabis and regulate[d] its production, manufacturing, distribution, and sale in New York."  *Variscite NY Four, LLC v. New York State Cannabis Control Bd.*, No. 1:23-cv-01599 (AMN/CFH), 2024 WL 406490, at *2 (N.D.N.Y. Feb. 2, 2024); *see* N.Y. Canbs. §§ 1, 3, 61-89.   The Cannabis Law establishes the Cannabis Control Board and Office of Cannabis Management (the entity defendants here).   *See* N.Y. Canbs. §§ 7-11.

New York has twice instituted application programs for retail cannabis dispensary licenses.   First, from August through September 2022, New York accepted applications under the Conditional Adult-Use Retail Dispensary ("CAURD") Application Program.   *See Variscite NY One, Inc. v. New York ("Variscite One")*, 640 F. Supp. 3d 232, 234 (N.D.N.Y. 2022), *reconsideration denied*, 2023 WL 1420662 (Jan. 31, 2023).   As a practical matter, only New Yorkers could apply--qualifying applicants needed, among other things, "a significant presence in New York"; to be "incorporated or otherwise organized under the laws of New York"; or to be "majority . . .

7

owne[d]" by "residents of New York."  9 N.Y.C.R.R. § 116.1-.9 (as effective August 3, 2022); *see Variscite One*, 640 F. Supp. 3d at 235.

In September 2022, Variscite One--a corporation with the same "minority owner" as the appellants here, Appellants' Br. 27--sought a preliminary injunction "restraining [New York officials] from issuing any cannabis licenses under the [CAURD] application program" for certain geographic areas.  *Variscite One*, 640 F. Supp. 3d at 234 (citation modified).  Variscite One challenged the presence or residency requirement as violative of the dormant Commerce Clause. *See id.*  The U.S. District Court for the Northern District of New York (Sharpe, *J.*) agreed and in November 2022 granted Variscite One a preliminary injunction.  *See id.* at 244.  The *Variscite One* litigation settled thereafter.  In August 2023, other plaintiffs also obtained a preliminary injunction restraining CAURD, this time on state law grounds.  *See Carmine Fiore v. N.Y. State Cannabis Control Bd.*, No. 907282-23, slip op. at 1 (N.Y. Sup. Ct. Aug. 18, 2023). Notwithstanding these barriers, New York has not shuttered

8

CAURD, and the state has managed to issue hundreds of licenses under the program. *See Variscite NY Four*, 2024 WL 406490, at *3.

Amid the challenges to CAURD, New York's Cannabis Control Board in September 2023 adopted regulations for a new application program that would be open to New Yorkers and out-of-state applicants alike: the Adult Use application program. The state split the Adult-Use applicants into two pools, with a separate number of licenses available to applicants in each pool. The first application pool (the "November Pool") was for applicants who could "demonstrate proof of control" over a location for their dispensary. JA522. New York closed the November Pool on November 17, 2023. Given the short turnaround between the announcement of the Adult Use Application Program and the closing of the November Pool, it stands to reason that applicants who could demonstrate proof of control of a dispensary location by the November Pool deadline would largely be those who had previously applied in the--dubious-- CAURD program.

All other applications were part of the second pool (the "December Pool"). Of them, those who had secured locations could apply for Adult Use licenses. Those who did not yet have control of a location could apply for a "provisional" Adult Use license, which afforded additional time to secure a location. New York closed the December Pool on December 18, 2023.

Adult Use applicants understood they were competing for a scarce good. At the time the Adult Use application windows closed, New York anticipated awarding only 250 dispensary licenses to November Pool applicants and 450 to December Pool applicants. To determine the order of review--and (by extension) which of the thousands of applicants could realistically obtain one of the few licenses--New York randomly assigned applicants positions on the November or December review queue (respectively, the "November Queue" and the "December Queue").[1]

---

[1] We refer below to the November or December "Pool" when discussing the group of applicants, and to the November or December "Queue" when discussing the order in which New York plans to review applications.

But the Adult Use program gave certain applicants a leg up. Pursuant to the Cannabis Law and its implementing regulations, New York must give an application "Extra Priority" if an applicant or its majority owner (a) is a member of a community disproportionately impacted by cannabis prohibition, (b) has an income lower than 80% of the median income of the county in which the applicant resides, *and* (c) either was convicted of a marijuana-related offense under New York law prior to New York's decriminalization of marijuana or has a close relative who was so convicted. N.Y. Canbs. § 87(3)); 9 NYCRR § 121.1(k). The Adult Use application program implemented this requirement by assigning to any applicant who claimed eligibility for Extra Priority *three* random positions in the November or December Queue--that is, triple the chance at an early slot. New York would review an applicant's claim of entitlement to Extra Priority when it reached that applicant's earliest queue position.

**II.**

Plaintiffs-Appellants Variscite NY Four, LLC ("Variscite Four") and Variscite NY Five, LLC ("Variscite Five," and together with

11

Variscite Four, "Variscite") applied for provisional Adult Use Licenses in the December Pool. Each claimed Extra Priority. Their majority owners lived for a number of years in "communities disproportionately impacted by cannabis prohibition" in Los Angeles; and the owners' incomes are lower than 80% of the median income of Los Angeles County, where they reside. However, these owners boast marijuana convictions under California (not New York) law, and thus fail to satisfy the third of the conjunctive Extra Priority requirements. *See* N.Y. Canbs. § 87(3)); 9 NYCRR § 121.1(k).

Because both Variscite Four and Variscite Five claimed Extra Priority, each received three December Queue positions: 816, 2121, and 3812 for Variscite Four; and 949, 2153, and 4147 for Variscite Five. But New York has represented that without Extra Priority, for which they do not qualify, Variscite Four and Variscite Five will inevitably forfeit at least their most favorable positions in the December Queue.

On the same day that Variscite Four and Variscite Five submitted their applications, they commenced this suit against New York's marijuana regulators, alleging that the Adult Use program

12

preferred New Yorkers in violation of the dormant Commerce Clause. Three days later, Variscite moved for a temporary restraining order and a preliminary injunction stopping New York from issuing: (1) Adult Use licenses (to November or December applicants) and (2) additional CAURD licenses. *Variscite NY Four*, 2024 WL 406490, at *1. After a hearing, the district court denied the motion on February 2, 2024. *Id.* Variscite timely appealed.

New York has represented that, two months after Variscite noticed this appeal, New York elected "to review all 1,799 microbusiness and dispensary applicants" from the November Pool and "issue licenses to all qualified applicants." N.Y. Br. 9-10. This displaced New York's announced plan to issue only 250 November Pool licenses. In turn, New York rescinded its previous projection that 450 dispensary licenses would be available to December Pool applicants such as Variscite. New York represents that it plans to complete its review of the November Queue before turning to the December Queue. The state will "share additional information about the number of licenses it intends to issue from the December

13

queue once review of the November queue is farther along." *Id.* at 11. But it is not looking good: the state is offering refunds of the application fee to December Pool applicants who, after this experience, may now wish to withdraw their applications.

Further complicating this picture, on December 12, 2024, New York Supreme Court, Albany County preliminarily enjoined New York from "processing any other *provisional* [adult-use license] applications"--*i.e.*, December Pool applications by applicants who had not secured locations for their dispensaries. *Organic Blooms, LLC v. N.Y. State Cannabis Control Bd.*, No. 904497-24, slip op. at 13 (N.Y. Sup. Ct. Dec. 17, 2024) (emphasis added). New York represents that this preliminary injunction currently prevents it from processing Variscite's license applications, as Variscite seeks only such "provisional" licenses.

**III.**

New York contends that this dispute is nonjusticiable because: (1) Variscite lacks standing to challenge licensing under (a) the CAURD program or (b) the November Pool of the Adult Use

14

program, since Variscite--which applied in the December Pool--did not apply to CAURD or in the November Pool; and (2) Variscite's constitutional challenges to the December Queue's Extra Priority regime have, since the time of the district court decision, become unripe because of the diminished chances of Variscite ever receiving an Adult Use license from the December Pool. We consider these justiciability arguments *de novo*. *Lacewell v. Off. of Comptroller of Currency*, 999 F.3d 130, 140 (2d Cir. 2021). For the reasons that follow, this controversy is justiciable in part.

Standing to Challenge CAURD Applications. Article III of the Constitution limits federal court jurisdiction to cases in which the plaintiff can show standing, *i.e.* "that she has suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (citation modified). "At the preliminary injunction stage, . . . the plaintiff

15

must make a clear showing that she is likely to establish each element of standing." *Id.* at 58.

Ordinarily, to establish standing to challenge an allegedly discriminatory program, a plaintiff must make application. *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 118 (2d Cir. 2025). "But a plaintiff need not go through the motions of formally applying when that would be a 'futile gesture.'" *Id.* (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365-66 (1977)). It is enough to "demonstrate that they are able and ready to apply, but a discriminatory policy prevents them from doing so on equal footing." *Id.*

Neither Variscite Four nor Variscite Five can allege that it was able and ready to apply to the CAURD program. They are LLCs that were first organized no earlier than November 30, 2023, after the CAURD application window closed in September 2022.

Variscite has not demonstrated standing to restrain the issuance of CAURD licenses without itself having applied for one. Variscite's sole objection is that issuing those licenses would violate

16

the Cannabis Law's directive that "the initial adult-use cannabis retail dispensary license application period shall be opened for all applicants at the same time." NY Canbs. § 10(19). But "Article III standing requires a concrete injury even in the context of a statutory violation." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021) (quoting *Spokeo, Inc. v. Robins*, 578 U. S. 330, 341 (2016)). Suits for injunctive relief premised on avoiding future harm must allege at least "a risk of future harm." *Id.* at 435.

Variscite has not attempted to demonstrate that it is affected by the issuance of CAURD licenses. Presumably Variscite considers CAURD applicants to be its competitors in the New York marijuana market, but Variscite has not argued on appeal how the CAURD program harms it even in this respect. Variscite therefore has not established its standing to challenge that program.

Standing to Challenge November Pool Applications. Variscite asserts that its application in the December Pool gives it standing to challenge the whole Adult Use application program, including applications from the November Pool. Moreover,

17

Variscite argues that the division of Adult Use applications into November and December Pools was itself a burden on out-of-state applicants that violated the dormant Commerce Clause, and that the Adult Use program should be treated as a single program, so that Variscite has standing to enjoin the issuance of any Adult Use license.

New York responds that the Adult Use program's November and December Pools represent discrete application programs. Because Variscite did not apply in the November Pool, New York argues, Variscite lacks standing to challenge the issuance of November Pool licenses. Indeed, Variscite was scarcely able and ready to apply in the November Pool, as Variscite Four and Variscite Five were not organized until roughly two weeks after it closed.

New York is correct that the November Pool and December Pool were discrete. Applicants understood as much for at least a month before the November Pool closed. By no later than October 17, New York had announced the criteria for the November Pool, including both its deadline and the requirement that applicants already have control over premises for a dispensary. The November

18

Pool and December Pool have a separate number of licenses available to applicants, so that each applicant competes for a license only against the other applicants in their pool. The November Pool and December Pool are therefore separate programs.

Because the November Pool and December Pool are distinct, New York argues that Variscite--which applied only for December Pool licenses--lacks standing to challenge November Pool licenses, just as Variscite lacks standing to challenge CAURD licenses. New York claims that "the way in which the November Queue was ordered for review and the awarding of licenses does not affect when or whether [Variscite] receive[s] cannabis licenses on the separate December Queue." N.Y. Br. 23. Consequently, New York argues, the November application window does not injure Variscite in its parallel competition for December licenses.

Not so. In arguing that Variscite's challenge to the *December* Pool is unripe, New York asserts that it "does not know how many licenses will be available for retail dispensaries on the December Queue and will not know until it has a clearer idea of *how many licenses*

19

*will be awarded to November Queue applicants* and how many more dispensaries the State's cannabis market can sustain." *Id.* at 26 (emphasis added). Thus, Variscite's claims concerning *December* licenses are said to be unripe precisely because New York may issue too many *November* licenses--that is, New York's improper award of up to nearly 1,800 November Pool licenses would reduce Variscite's odds of obtaining a December license. That threat of harm distinguishes Variscite's challenge to November Pool licenses from its challenge to CAURD licenses.

Nevertheless, Variscite lacks standing to challenge the November Pool licensing scheme in its entirety. *See Brokamp v. James*, 66 F.4th 374, 389 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 1095 (2024). "[S]tanding is not dispensed in gross." *Id.* (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)). Variscite posits no way that the awarding of Extra Priority to certain November Pool applicants injures Variscite. No matter the order within the November Queue, every November Pool application will still be reviewed before review

20

of Variscite's December Pool applications. Variscite therefore cannot challenge the internal ordering of the November Queue.

Variscite does, however, have standing to challenge the fact that the November Pool will be processed before the December Pool. Variscite contends that the barrier to entering the November Pool--control over property in New York by an early deadline--itself violated the dormant Commerce Clause. Variscite plausibly explains that this barrier was engineered to filter for former CAURD applicants, and thus for New Yorkers. On this theory, Variscite's inability to apply in the November Pool was chiefly because Variscite is not owned by New Yorkers. Variscite has standing to make that narrow argument.

Ripeness Challenge to December Pool Applications. New York (rightly) does not contest Variscite's standing to challenge the Extra Priority regime for the December Queue. Instead, New York argues that Variscite's challenge to the issuance of December Pool licenses is constitutionally and prudentially unripe.

21

"To be justiciable, a cause of action must be ripe--it must present a real, substantial controversy, not a mere hypothetical question." *Vill. Green at Sayville, LLC v. Town of Islip*, 43 F.4th 287, 293 (2d Cir. 2022) (citation omitted). Ripeness has both a constitutional and a prudential dimension. Article III requires the parties to have "a live controversy affecting [a party's] rights." *Cotton v. Noeth*, 96 F.4th 249, 256 (2d Cir. 2024). "This aspect of the ripeness doctrine overlaps with the standing doctrine," and usually a determination "that a plaintiff has Article III standing is enough to render its claim constitutionally ripe." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 110 (2d Cir. 2013); *see also Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013) ("Often, the best way to think of constitutional ripeness is as a specific application of the actual injury aspect of Article III standing."). The prudential ripeness doctrine "allows a court to determine that the case will be better decided later." *Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*, 10 F.4th 87, 100 (2d Cir. 2021) (citation omitted). "In determining whether a claim is prudentially ripe, we ask whether the

claim is fit for judicial resolution and whether and to what extent the parties will endure hardship if decision is withheld." *Id.* (citation omitted). "In general, the more the matter to be placed before the court involves a pure issue of law, unaffected by factual considerations, the less the concern that judicial review might" be premature. *Lab. Council for Latin Am. Advancement v. U.S. Env't Prot. Agency*, 12 F.4th 234, 253 (2d Cir. 2021).

Variscite's challenge to the Extra Priority regime in the December Queue is both constitutionally and prudentially ripe.

As to constitutional ripeness, the December Queue is still there, and Variscite's place on it was determined in part by the Extra Priority regime. It is not clear on the record today how long Variscite will wait before New York reviews December Pool applications, or whether New York will be able to review Variscite's provisional license application. But until New York dissolves the December Queue or purges all provisional applications from it, there is an Article III "live controversy" between Variscite and New York. *Cf. Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 118 (2d Cir. 2025) (recognizing

23

that a plaintiff has Article III standing to challenge "a discriminatory policy [that] prevents" the plaintiff from applying to a program "on equal footing").

New York's primary argument as to the December Queue is one of prudential ripeness. New York notes that it has changed its process for reviewing the November and December Queues and now might grant so many November Pool licenses that Variscite may lose out on a license entirely because it did not apply in the November Pool, rather than because of the Extra Priority scheme in the December Queue. The risk of harm from the Extra Priority scheme is said to be further diminished by the state court preliminary injunction that currently prevents New York from processing provisional applications like Variscite's at all. New York asks us to wait to see if it scraps the December Queue's provisional applications, before we decide the merits.

Prudence does not require a delayed adjudication in this case. The district court decided the merits of this case, and it is only said to have become unripe between that disposition and this appeal. In

24

such circumstances, we do not usually stay our hand as a prudential matter. For example, in *Cotton*, suit had been dismissed based on the plaintiff's accumulation of "at least three strikes" under the Prison Litigation Reform Act; we held that the appeal was prudentially ripe even after the government conceded on appeal that the plaintiff had at that point no more than a single "strike," and therefore clearly did not have "at least three." *See* 96 F.4th at 256–57. We proceeded to reach the question of whether the plaintiff had one or zero strikes because: "whether [the purported strike] counts as a strike is a purely legal question involving no future contingencies"; "leaving the issue unresolved could impose a hardship on [the plaintiff] by affecting his ability to sue in the future"; and "deciding the question would not impose hardship on the State because it, like [the plaintiff], has an interest in judicial efficiency and clarification of the law." *Id.*

For similar reasons, Variscite's challenge to the ordering of the December Queue is prudentially ripe, notwithstanding the contingencies that New York has highlighted or created. It is a legal question whether granting Extra Priority to December Pool applicants

25

violates the dormant Commerce Clause, the answer to which will not change, and rendering an answer would impose no hardship on the State, which "has an interest in judicial efficiency and clarification of the law." *Id.* at 257. Avoiding the question now would mean that, by the time Variscite can again present the question to a court, it is likely to have suffered its asserted constitutional injury of losing out to a New York competitor--and at that point, it may be considerably harder for a district court to craft an appropriate injunction. Consequently, withholding determination "could impose a hardship on [Variscite] by affecting [its] ability" to obtain judicial relief "in the future." *Id.*

\* \* \*

In sum, Variscite can challenge the issuance of (a) December Pool licenses, based on purported unlawful ordering within the December Queue, and (b) November Pool licenses, insofar as an unlawful preference is accorded to the entire November Pool--but not the ordering within it. However, Variscite has not established standing to enjoin the issuance of CAURD licenses.

**IV.**

To obtain a preliminary injunction that "will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Agudath Isr. of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020) (citation omitted). When, as here, a plaintiff alleges constitutional injury, "a strong showing of a constitutional deprivation that results in noncompensable damages ordinarily warrants a finding of irreparable harm." *A.H. ex rel. Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021). Similarly, "[n]o public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal." *Agudath Isr.*, 983 F.3d at 637. "Likelihood of success on the merits is therefore the dominant, if not the dispositive, factor" in awarding preliminary relief. *A.H. ex rel. Hester*, 985 F.3d at 176 (citation modified).

27

We review a district court's denial of a preliminary injunction for abuse of discretion. *Agudath Isr.*, 983 F.3d at 631. However, we "must assess *de novo* whether the court proceeded on the basis of an erroneous view of the applicable law." *Id.*

The Commerce Clause "vests Congress with the power to 'regulate Commerce . . . among the several States.'" *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023) (quoting U.S. Const. art. I, § 8, cl. 3). It "not only vests Congress with the power to regulate interstate trade," but also "contains a further, negative command, one effectively forbidding the enforcement of certain state economic regulations even when Congress has failed to legislate on the subject." *Id.* (citation modified). "[B]y its own force," the Commerce Clause "restricts state protectionism." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 518 (2019). "[S]tate laws offend the Commerce Clause when they seek to build up domestic commerce through burdens upon the industry and business of other States . . . ." *Nat'l Pork*, 598 U.S. at 369 (citation modified). "Today," under the Supreme Court's "modern cases," the "very core

28

of our dormant Commerce Clause jurisprudence" is an "antidiscrimination principle" expressed through a bright-line rule: "the Commerce Clause prohibits the enforcement of state laws driven by economic protectionism--that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.* (citation modified).

The "fundamental objective" behind this rule is to "preserv[e] a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997). That objective applies with some irony in the context of *illicit* markets; but the objective should not be conflated with the rule itself. In the context of the affirmative Commerce Clause, it is "of no constitutional import" that "the marijuana market is an unlawful market that Congress sought to eradicate," and not "a lawful market that Congress sought to protect and stabilize." *Gonzales*, 545 U.S. at 19 n.29. The same holds for the dormant Commerce Clause.

If federally illegal markets were constitutionally different, states could shelter from the dormant Commerce Clause in any market where a federal prohibition is nominal: on the books, but unenforced--perhaps even a candidate for repeal. Consider *medical marijuana*. Although it is criminalized at the federal level, *see* 21 U.S.C. § 812(c)(Schedule I)(c)(10), Congress has defunded enforcement of that prohibition every fiscal year since 2015, through a rider known as the Rohrabacher-Farr Amendment, *see* Consolidated Appropriations Act of 2024, Pub. L. No. 118-42, § 531, 138 Stat. 25. *See also Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Me.*, 45 F.4th 542, 547-48, 551 (1st Cir. 2022). The legal status of medical marijuana differs from that of other contraband in degree, not in kind. *See Ne. Patients*, 45 F.4th at 559 (Gelpí, J., dissenting). If markets were exempt from the dormant Commerce Clause so long as they were illicit, the medical marijuana market would enjoy such exemption. *See id.* (acknowledging this implication). States would then be free today to bake in advantages for their residents should Congress later legalize the market, and protectionism would, in the end, have

30

"[]disturbed" a "national market for competition" through "preferential advantages conferred by [the] State upon its residents or resident competitors." *Gen. Motors*, 519 U.S. at 299.

True, the bright-line rule of the dormant Commerce Clause is subject to an exception: "Congress may use its powers under the Commerce Clause to confer upon the States an ability to restrict the flow of interstate commerce that they would not otherwise enjoy." *New Eng. Power Co. v. New Hampshire*, 455 U.S. 331, 340 (1982). However, "for a state regulation to be removed from the reach of the dormant Commerce Clause, congressional intent must be unmistakably clear." *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91 (1984). Though the statute need not "expressly state that it is authorizing a state to engage in activity that would otherwise violate the Dormant Commerce Clause," Congress must "clearly allow the state to engage in such activity." *Am. Trucking Ass'ns, Inc. v. N.Y. State Thruway Auth.*, 886 F.3d 238, 245 (2d Cir. 2018).

The text of a mine-run criminal penalty conveys no such intention. We decline to read into myriad criminal laws "a

congressional purpose which would be only the product of this Court's imagination." *California v. Zook*, 336 U.S. 725, 732–33 (1949) (rejecting similarly broad-brush presumption that every federal ban on interstate traffic displaces parallel state bans). And it would be a lively imagination: we would be assuming that Congress means to permit protectionism as long as it is comorbid with a federal offense, incentivizing the states to legalize--for just their own citizens--whatever Congress forbids.

To privilege state protectionist legislation, Congress must do more than disapprove of an interstate market: it must approve *the protectionism itself*. We know what that language looks like: for example, "silence on the part of the Congress shall not be construed to impose *any barrier* to the regulation or taxation of such business by the several States." *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 429 (1946) (emphasis added) (quoting McCarran-Ferguson Act of 1945, 15 U.S.C. § 1011) (holding that this text sufficed). Imposing criminal penalties, without more, is insufficient. If states enjoy a colorable basis for evading the dormant Commerce Clause in any novel market

that may run afoul of a longstanding federal criminal regulatory regime, a state could justify its violation of the federal Constitution on the ground that its citizens are federal offenders.

Congress has not "clearly allowed" New York to "engage in activity that would otherwise violate the Dormant Commerce Clause." *Am. Trucking Ass'ns*, 886 F.3d at 245. The only relevant Congressional enactment in this case is the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 et seq. Under the CSA, the "manufacture, distribution, or possession of marijuana" outside of select scientific studies is "a criminal offense." *Gonzales v. Raich*, 545 U.S. 1, 14 (2005); *see* 21 U.S.C. §§ 812(c)(Schedule I)(c)(10), 841(a)(1). The congressional objective behind this criminal prohibition was "eradicat[ing]" the "marijuana market" and "eliminating commercial transactions in the interstate market in their entirety." *Gonzales*, 545 U.S. at 19 & n.29. A prohibition intended to eradicate an *inter*state market is not a license for states to incubate *intra*state markets in the same product. The First Circuit--the only other Court of Appeals to consider the question--is in accord. *See Ne. Patients*, 45 F.4th at 554

("[P]rotectionist measures necessarily . . . encourage precisely what the CSA seeks to stop--trade by in-staters in the [cannabis] market.").

Federal bans on interstate commerce can (sometimes) implicitly authorize complementary state *bans*. *See, e.g., Zook*, 336 U.S. at 727, 730 (upholding interstate transportation restriction that was "substantially the same" as a federal one); *Pic-A-State PA, Inc. v. Com. of Pa.*, 42 F.3d 175, 179 (3d Cir. 1994) (upholding, as "complement[ary]," state ban on in-state sales of lottery interests given federal ban on interstate sales of the same). But New York has not banned interstate marijuana traffic; indeed, it even gives preferences in licensing to New York expatriates who obtained marijuana convictions before leaving the state.

The dissent contends that New York's law here would complement the CSA's ban on interstate marijuana traffic by modestly burdening that traffic. *See* Dissent at 7-8. The dissent reasons that if the CSA authorizes state bans on interstate marijuana traffic, it necessarily authorizes lesser interferences like New York's. *See id*. The dissent concludes that it would "undermine[] the CSA's

objective" to apply the dormant Commerce Clause here because it would "require New York to offer [dispensary] licenses on nondiscriminatory terms" when the state would otherwise curb some interstate traffic through its discriminatory licensing. *Id.* at 8 (citing *Gonzales*, 545 U.S. at 19).

New York disagrees that its licensing regime will have this effect. The state affirmatively contends that its preference for New York offenders is "[a]t most . . . an *incidental* burden on interstate commerce," N.Y. Br. 52--*i.e.*, one that is too unobtrusive to help eradicate the interstate marijuana market.

In any event, the dissent's analysis blurs two distinct inquiries: (1) which state laws the dormant Commerce Clause would prohibit absent congressional action, and (2) which subset of laws the CSA has exempted from that prohibition. Absent congressional action, the dormant Commerce Clause would forbid New York from enacting *any* protectionist measure in the interstate marijuana market-- whether a total ban or a lesser restriction. The dispositive question is therefore which (if any) protectionist measures Congress has

35

authorized New York to enact nevertheless. The answer cannot be drawn (as the dissent draws it) from "[g]eneral propositions derived from the whole sweep of the Commerce Clause," *Zook*, 336 U.S. at 733, so that all regulation of interstate traffic necessarily burdens it. Rather, the question "can be resolved only by careful scrutiny of the particular activity regulated." *Id.* at 734.

Even if the CSA authorized New York to ban, burden, or punish interstate marijuana traffic, the CSA cannot, for the reasons discussed, be read to bless what New York did instead: preference New Yorkers when issuing dispensary licenses. Such a preference does not inhibit interstate marijuana traffic; it creates an incentive to institutionalize the marijuana industry and help it flourish. The dormant Commerce Clause's rule, not its exception for conduct that Congress has "clearly allowed," governs here.

**V.**

Under the dormant Commerce Clause, "a law that clearly discriminates against interstate commerce is per se invalid unless the government has 'no other means to advance a legitimate local

36

purpose.'" *Rest. L. Ctr. v. City of New York*, 90 F.4th 101, 118 (2d Cir. 2024) (quoting *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338-39 (2007)). Discrimination "means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *N.Y. Pet Welfare Ass'n v. City of New York*, 850 F.3d 79, 89 (2d Cir. 2017) (citation omitted). A law may discriminate against interstate commerce "on its face, harbor a discriminatory purpose, or discriminate in its effect." *Id.* at 90.

    <u>December Pool Applications.</u> Variscite argues that the ordering of the December Queue discriminates against out-of-staters because Extra Priority is conditioned on a New York marijuana conviction by March 31, 2021, when New York repealed its marijuana prohibitions. We agree.[2]

    Extra Priority in the application queue is an economic benefit-- especially because New York has indicated that only those earliest in

---

[2] We accordingly need not reach Variscite's other dormant Commerce Clause objections to December Pool licensing.

the December Queue are likely to receive licenses. If New York required in-state residency as a prerequisite to Extra Priority, there would be no doubt that it was discriminating against out-of-state economic interests. *See, e.g.*, *Tenn. Wine*, 588 U.S. at 518 ("Tennessee's 2-year durational-residency requirement plainly favors Tennesseans over nonresidents . . . ."). That is essentially the defect that the *Variscite One* court identified with CAURD. *See Variscite NY One, Inc. v. New York*, 640 F. Supp. 3d 232, 240-41 (N.D.N.Y. 2022), *reconsideration denied*, 2023 WL 1420662 (Jan. 31, 2023).

The Adult Use Application Program is a workaround that does not work. New York has crafted a prerequisite for Extra Priority that is a proxy and correlative for applicants who were New York residents in March 2021 or earlier (or whose relatives were). This is because "the usual 'legislative power of a State'" extends to "'persons and property *within the limits of its own territory*.'" *Nat'l Pork*, 598 U.S. at 375-76 (2023) (quoting *Hoyt v. Sprague*, 103 U.S. 613, 630 (1881)) (emphasis added). New York could not "prosecute the citizen of another State for acts committed outside [New York's] jurisdiction

38

that are not intended to produce or that do not produce detrimental effects within [New York]." *Id.* (citation modified). Consequently, New York marijuana offenders will reliably have been present in New York before the state decriminalized marijuana (*i.e.*, sometime before March 31, 2021). It is fair to assume that they are New Yorkers, overwhelmingly.[3]

It is of no moment that New York marijuana offenders are just a subset of all New York offenders, and an even smaller subset of all New Yorkers. They are still New Yorkers--and not Californians. The dormant Commerce Clause does not tolerate discrimination in favor of a sliver of the in-state market. Thus, *Bacchus Imports, Ltd. v. Dias* struck down as discriminatory a Hawaii tax that advantaged pineapple wine and okolehao--alcoholic beverages produced

---

[3] *See, e.g.*, Stephen Mercer & Jessica Gabel, Shadow Dwellers: The Underregulated World of State and Local DNA Databases, 69 N.Y.U. Ann. Surv. Am. L. 639, 669 n.200 (2014) ("[D]ata released from the FBI indicates that in more than 87% of the offender hits in the database, the crime took place in the same state in which the offender provided a DNA sample. That follows the trend that police officers have seen for ages: criminals tend to offend locally . . . ." (citation omitted)).

overwhelmingly in Hawaii--even though the two products represented "well under one percent of the total liquor sales in Hawaii." 468 U.S. 263, 268 (1984). *Bacchus* concluded that "the effect of the [law] is clearly discriminatory, in that it applies only to locally produced beverages, even though it does not apply to all" segments of the market. *Id.* at 271.

"[D]isparate treatment of in-state and out-of-state" commercial traffic "is just as much a violation of the Commerce Clause as disparate treatment of in-state and out-of-state [persons]." *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 219 (2d Cir. 2004). Accordingly, under *Bacchus*, New York's Extra Priority regime is discriminatory, even though it advantages only a subset of likely New Yorkers.

True, the wall erected against non-New Yorkers has some holes: some New York offenders may have moved elsewhere, or have close relatives out-of-state who thus get derivative eligibility. But it is sufficiently obvious from the face of New York's licensing laws that those eligible for Extra Priority in the December Pool will be New Yorkers overwhelmingly. The criteria themselves demonstrate that

40

the law's "discriminatory impact on interstate commerce was not an unintended byproduct." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 352 (1977). Because the discrimination here is apparent from the statutory text, we do not need a more developed record demonstrating the law's practical effect.

New York says it chose its criteria for Extra Priority to further "restorative justice and social equity goals," not to privilege New Yorkers. N.Y. Br. 4. Per New York, Extra Priority corrects for marijuana criminalization, with supposedly "devastating collateral consequences including mass incarceration and other complex generational trauma, that inhibit an otherwise law-abiding citizen's ability to access housing, employment opportunities, and other vital services." *Id.* (quoting N.Y. Canbs. § 2). But the acknowledgement that it wishes to favor that population--regardless of theory--betrays the purpose: to favor New Yorkers over others. If New York so wishes to privilege that population, it may do so "as a market participant"--but not "as a market regulator," which is its role here. *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 98-99 (1984).

41

Because the Extra Priority regime is discriminatory, it is constitutional only if "the government has 'no other means to advance a legitimate local purpose.'" *Rest. L. Ctr.*, 90 F.4th at 118 (quoting *United Haulers Ass'n*, 550 U.S. at 338-39). New York acknowledges as much, but does not attempt to satisfy this "strictest scrutiny," *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 581 (1997) (citation omitted)--even if we assume that the invocation of restorative justice is a legitimate local purpose. [4] Consequently, Variscite is likely to succeed on the merits of its challenge to the ordering of the December Queue.

November Pool Applications. Variscite also challenges the creation of a November Pool that takes precedence over all December Pool applicants. Variscite's theory is that the November Pool was created as a vehicle to preference CAURD applicants in limbo. And because CAURD applicants are, almost necessarily, New Yorkers,

---

[4] It is rarely a good sign when defenses are premised on attaching an adjective to the word "justice."

Variscite argues that this maneuver violated the Dormant Commerce Clause.

While this theory may yet have merit, the preliminary record is insufficient to permit injunctive relief based on it. The criterion for accessing the November Pool is facially neutral: control of adequate premises in New York for a dispensary by November 17, 2023. Variscite reasons that the law is nevertheless discriminatory in its purpose or effect because out-of-staters were unlikely to meet this criterion. Per Variscite, out-of-staters would have been unlikely to have already acquired premises, since they were ineligible to open dispensaries under CAURD. And they had slim odds of finding suitable premises before the November Pool deadline because of onerous zoning restrictions.[5]

---

[5] *See, e.g.*, 9 NYCRR § 119.1(a) ("No municipality may adopt a local law which would allow an adult-use retail dispensary . . . to be: (1) on the same road and within 200 feet of the entrance of a building occupied exclusively as a house of worship; (2) on the same road and within 500 feet of the entrance of a building occupied exclusively as a school; or (3) on the same road and within 500 feet of a structure or its grounds occupied exclusively as a public youth facility . . . .").

Though Variscite's logic is sound, it has not adduced sufficient evidence that the November Pool had the purpose or effect of prioritizing New Yorkers.   We therefore cannot apply strict scrutiny at this stage.   Instead, we apply a more lenient test: a *non-discriminatory* law violates the dormant Commerce Clause only if it imposes a burden on interstate commerce that is "'clearly excessive' in relation to its local benefits."   *Rest. L. Ctr*, 90 F.4th at 107 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).   For this test, where the state is not discriminating against out-of-state economic interests, it *does* matter that marijuana is federal contraband: it is not a "clearly excessive" burden on interstate commerce for a local law to impede a national black market.   Therefore, even assuming that the creation of the November Pool incidentally burdens the interstate marijuana market, the burden it imposes is not "clearly excessive." Consequently, Variscite has not shown that it is likely to succeed on

44

the merits of its dormant Commerce Clause challenge to the November Pool.

## VI.

This case is the byproduct of the federal government's unusual and ambivalent regulation of marijuana. It is hard to seriously imagine states passing protectionist legislation in most federally criminalized interstate markets--few state legislatures would bother passing laws to favor their local hitmen. In this strange circumstance, where a layperson might think that marijuana is actually legal in New York, we nevertheless apply a familiar rule: state protectionism is forbidden unless Congress says otherwise--and Congress has not said otherwise.

For the foregoing reasons, the district court erred in concluding that Variscite was unlikely to succeed on the merits of its dormant Commerce Clause challenge to the ordering within the December Queue. The district court further erred by assessing the remaining preliminary injunction factors under the assumption that Variscite would not suffer a constitutional injury. *See Variscite NY Four, LLC*

45

*v. New York State Cannabis Control Bd.*, No. 1:23-cv-01599 (AMN/CFH), 2024 WL 406490, at \*13 (N.D.N.Y. Feb. 2, 2024). We therefore VACATE the district court's decision denying Variscite's motion for a preliminary injunction and REMAND for further proceedings consistent with this opinion.

*Variscite NY Four, LLC v. New York State Cannabis Control Board*, No. 24-384

DEBRA ANN LIVINGSTON, *Chief Judge*, dissenting:

If (1) the "fundamental objective" of a judicially implied doctrine is to "preserv[e] a national market," *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997), (2) Congress has the "undoubted power" to override the doctrine's application, *S. Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 769 (1945), and (3) Congress has sought to "eradicate" a certain national market, *Gonzales v. Raich*, 545 U.S. 1, 19 n.29 (2005), do the doctrine's protections apply to that market? The obvious answer is the correct one.

The majority and I agree on each of these three premises. *See* Maj. Op. at 29, 31, 33. We are also in agreement that "[f]ederal bans on interstate commerce can"—at least "sometimes"—"implicitly authorize complementary state bans," including in markets where the state continues to permit *intra*state commerce. *Id.* at 34 (emphasis omitted).[1] Of course, a state ban on *inter*state commerce in a market where the state permits *intra*state commerce is a perfectly protectionist

---

[1] Specifically, the majority cites *Pic-A-State PA, Inc. v. Pennsylvania*, 42 F.3d 175 (3d Cir. 1994), as an example of a case in which a "[f]ederal ban[] on interstate commerce . . . implicitly authorize[d] [a] complementary state ban[]." Maj. Op. at 34 (emphasis omitted). *Pic-A-State* involved similar federal and state prohibitions on the interstate sale of lottery interests. *See* 42 F.3d at 177–78. And the Third Circuit concluded that because the state prohibition "complement[ed] the federal statute," it "d[id] not violate the dormant Commerce Clause." *Id.* at 180. It reached this conclusion even though the state continued to permit the intrastate sale of its own lottery tickets. *See id.* at 177.

state law—the chief evil the dormant Commerce Clause generally guards against. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023). Thus, we agree that federal criminalization of a market—at least "sometimes"—renders the dormant Commerce Clause inapplicable to perfectly protectionist state laws in that market. Maj. Op. at 34. We also agree that nondiscriminatory state laws that "incidentally burden[]" illegal markets *always* survive dormant Commerce Clause scrutiny. *Id.* at 44.

Starting from the right premises, however, the majority ultimately draws one wrong—and obviously wrong—conclusion. It concludes that the dormant Commerce Clause nonetheless continues to bar partial state restrictions on federally illegal interstate commerce that amount to something more than an incidental burden and something less than perfect protectionism.[2] In my view, that is neither a "bright-line rule" nor a sensible one. *Id.* at 29, 31. When Congress criminalizes a market—and, by definition, seeks to "eliminat[e] commercial

---

[2] The majority opinion might also be read to suggest that the dormant Commerce Clause's application hinges not on the state law's actual protectionist purpose or effects, but on whether the state "affirmatively contends" that its law is or is not protectionist. Maj. Op. at 35. A state's arguments on appeal, however, cannot possibly be so dispositive. If Congress has rendered the dormant Commerce Clause inapplicable to certain state laws, a state cannot inadvertently resurrect the doctrine—and override congressional intent— by mischaracterizing its law's purpose or effects. What matters, rather, must be the law's true nature. And here, the majority concludes that New York's licensing scheme is facially discriminatory against non-New Yorkers and therefore protectionist. *See id.* at 40.

2

transactions in the interstate market"—I would presume that it authorizes states to enact their own laws that aid that objective, whether by banning, restricting, or burdening those transactions. *Gonzales*, 545 U.S. at 19. And I certainly would not interpret a doctrine implied from the Commerce Clause—an affirmative grant of power to Congress—to *require* states to enact laws that promote the very interstate commerce Congress wants to eradicate. Accordingly, I respectfully dissent.[3]

## I.

The Supreme Court has long recognized that Congress may exercise its "plenary" power over interstate commerce, *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 75 (1824), to override the dormant Commerce Clause and "permit the states to

---

[3] I agree with the majority that Variscite NY Four, LLC and Variscite NY Five, LLC's (collectively, "Variscite") challenge is justiciable at least with respect to the December Queue, and I would thus reach the question whether the dormant Commerce Clause applies. I disagree, however, with one aspect of the majority's analysis: in my view, the doctrine of mootness, not ripeness, offers the appropriate framework for assessing constitutional justiciability. New York, to be sure, frames its argument that this Court lacks jurisdiction in terms of constitutional ripeness. Yet New York's primary contention is that "intervening circumstance[s] ha[ve] deprived the plaintiff of a personal stake in the outcome of the lawsuit." *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 719 (2022) (alterations accepted and internal quotation marks omitted). And "[i]t is the doctrine of *mootness* . . . that addresses whether" this has occurred. *Id.* This distinction is important because while the plaintiff bears the initial burden of establishing justiciability "at the time the action commences," *Carney v. Adams*, 592 U.S. 53, 59–60 (2020) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000)), the defendant "bears the burden to establish that a once-live case has become moot," *West Virginia*, 597 U.S. at 719. And "[t]hat burden is 'heavy where, as here" the defendant argues primarily that their "voluntary conduct" (e.g., the reallocation of licenses from December to November applicants) has deprived this Court of jurisdiction. *Id.* (internal quotation marks omitted). New York cannot avoid this burden merely by casting its mootness arguments in ripeness terms. Thus, while the majority ultimately reaches the correct result—that Variscite's December Queue challenge is constitutionally justiciable—it should have reached this result by applying the doctrine of mootness.

3

regulate . . . commerce in a manner which would otherwise not be permissible," *S. Pac. Co.*, 325 U.S. at 769. This power is "undoubted," *id.*, and "unquestionabl[e]," *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 572 (1997). To exercise it, Congress must "clearly express[]" its "intent." *Hillside Dairy Inc. v. Lyons*, 539 U.S. 59, 66 (2003). But it "need not expressly state that it is authorizing a state to engage in activity that would otherwise violate the [d]ormant Commerce Clause." *Am. Trucking Ass'ns, Inc. v. N.Y. State Thruway Auth.*, 886 F.3d 238, 245 (2d Cir. 2018). Such a requirement would of course be absurd in the context of illegal markets. When Congress has made clear it wishes to eradicate a national market, we should not "expect [it] to speak out of both sides of its mouth." *Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Me.*, 45 F.4th 542, 559 (1st Cir. 2022) (Gelpí, *J.*, dissenting).

Rather, in assessing whether a federal criminal law authorizes state laws that might otherwise violate the dormant Commerce Clause, courts have focused on whether the state laws "aid[]," *Ne. Patients Grp.*, 45 F.4th at 556 (internal quotation marks omitted), or "complement[]," *Pic-A-State PA, Inc. v. Pennsylvania*, 42 F.3d 175, 180 (3d Cir. 1994), the federal proscription. *See also California v. Zook*, 336 U.S. 725, 729 (1949) ("[W]hether Congress has or has not expressed itself, the

4

fundamental inquiry, broadly stated, is the same: does the State action conflict with national policy?"). At bottom, this inquiry is one of "congressional intent." *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91 (1984). And an obvious corollary to the principle that a federal criminal prohibition suggests Congress welcomes complementary state laws is that Congress would not want states to be *required* to enact laws that undermine its objectives.

The majority appears broadly to agree with this approach. *See* Maj. Op. at 34. And it acknowledges that complementary state bans aid federal bans on interstate commerce. *Id.* Common sense suggests the same is true of state restrictions—short of bans—on interstate commerce. As relevant here, any state restriction on interstate commerce in marijuana—for example, prohibiting investment by an out-of-stater in a state's retail market—seems plainly to aid the Controlled Substances Act's ("CSA") objective of "eradicat[ing]" or "eliminating" interstate marijuana transactions "in their entirety." *Gonzales*, 545 U.S. at 19 & n.29.

The majority, however, concludes otherwise. According to the majority, "protectionist measures necessarily . . . encourage precisely what the CSA seeks to stop—trade by in-staters in the [cannabis] market." Maj. Op. at 34 (quoting *Ne. Patients Grp.*, 45 F.4th at 554). This is wrong in two respects.

5

First, it miscomprehends the relevant baseline for our analysis. Neither party has challenged New York's decision to permit an *intra*state marijuana market. That decision thus has no bearing on whether New York's restriction on *inter*state commercial transactions aids Congress's objective of eliminating such transactions. Our analysis must focus only on the *challenged aspects* of New York's licensing scheme.

Second, contrary to the majority's suggestion, the CSA's ultimate objective is not "to stop [] trade by *in-staters*," *id.* at 34 (emphasis added) (quoting *Ne. Patients Grp.*, 45 F.4th at 554); it is to "eliminat[e] commercial transactions in the *inter*state market," *Gonzales*, 545 U.S. at 19 (emphasis added). This is for good reason. While Congress has the power to regulate some purely intrastate activity, this power derives from its authority "[t]o regulate Commerce . . . *among* the several States." U.S. Const. art. I, § 8 (emphasis added); *see also Gonzales*, 545 U.S. at 40 (Scalia, *J.*, concurring in the judgment) ("Congress's authority to enact [the CSA's] prohibitions of *intra*state controlled-substance activities depends . . . upon whether they are appropriate means of achieving the legitimate end of eradicating Schedule I substances from *inter*state commerce." (emphasis added)). As a result, in assessing whether the challenged aspects of New York's licensing scheme aid

6

Congress's objective, we must focus on Congress's ultimate, constitutionally authorized objective: "eliminating . . . interstate" marijuana transactions. *Gonzales*, 545 U.S. at 19. "That the [CSA] ensnares some purely intrastate activity" to achieve this objective "is of no moment," and does not alter our focus. *Id.* at 22.

Thus, while the majority may be correct that "protectionist measures . . . encourage . . . trade by in-staters" to some extent, that is beside the point. Maj. Op. at 34 (quoting *Ne. Patients Grp.*, 45 F.4th at 554). What matters, rather, is that "protectionist measures necessarily . . . [*dis*]courage precisely what the CSA seeks to stop—trade by [*out-of*]-staters in the cannabis market." *Id.* (alteration accepted) (quoting *Ne. Patients Grp.*, 45 F.4th at 554). This is true whether the measures are perfectly or only partially protectionist. All such measures discourage interstate commercial transactions to some extent and thus aid the CSA's objective of eliminating those transactions.

On the other hand, application of the dormant Commerce Clause affirmatively undermines the CSA's objective. It compels New York to permit

7

more out-of-state participation in its marijuana market.[4]  This Court's judgment does not touch New York's antecedent decision to allow an intrastate marijuana market; it affects only the extent to which New York must open that market to interstate commerce.  And all else equal, Congress would prefer as many New York retail licenses as possible to go to New Yorkers, confining commerce within the state's borders.  Applying the dormant Commerce Clause, however, would require New York to offer those licenses on nondiscriminatory terms to out-of-state applicants—inviting the very interstate commercial transactions that Congress has sought to "eliminat[e] . . . in their entirety."  *Gonzales*, 545 U.S. at 19.

In sum, applying the dormant Commerce Clause to illegal markets not only prevents states from enacting laws that aid Congress's objectives; it requires states to enact laws that undermine those objectives.  It is thus difficult to see how the CSA is anything but a "clear[] express[ion]" of Congress's "intent" that the dormant Commerce Clause should not apply to the market for marijuana.  *Hillside Dairy*, 539 U.S. at 66.

---

[4] Perhaps, on the majority's approach, New York could also alter its licensing scheme in the other direction and *prohibit all* out-of-state participation.  The majority concludes, after all, that federal bans "sometimes" authorize such perfectly protectionist state laws.  Maj. Op. at 34.  As discussed below, however, this result—encouraging states to evade dormant Commerce Clause scrutiny through more flagrant protectionism—would turn the doctrine on its head and cannot be reconciled with any conception of its purpose.

**II.**

Notwithstanding this overwhelming evidence of congressional intent, the majority concludes that Congress must "approve *the protectionism itself*" in more express terms to render the doctrine inapplicable. Maj. Op. at 32. As explained above, our precedent has never required such magic words. *Cf. Am. Trucking Ass'ns*, 886 F.3d at 245 ("Congress need not expressly state that it is authorizing a state to engage in activity that would otherwise violate the [d]ormant Commerce Clause."). Yet even if we were to impose such a requirement in the context of legal commerce, it has no place in markets Congress has criminalized. The majority appears at times to recognize as much, concluding that criminalization alone suffices to authorize (at least "some[]") perfectly protectionist state laws, Maj. Op. at 34, and (all) "incidentally burdens[ome]" ones, *id.* at 44. The dormant Commerce Clause's purpose confirms that nothing more should be required of Congress to render the doctrine wholly inapplicable to federally illegal markets.

At the outset, the dormant Commerce Clause's purpose is plainly relevant to assessing what should be required of Congress to override the doctrine's application. The doctrine itself—which lacks an express textual foundation—was inferred from the Framers' objectives in "calling the Constitutional Convention," and courts have thus routinely looked to the doctrine's purpose to interpret its

9

limits. *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 517 (2019) (internal quotation marks omitted). Indeed, the Supreme Court justified the need for a clear expression of congressional intent to override the dormant Commerce Clause based on "the policies underlying dormant Commerce Clause doctrine."[5] *S.-Cent. Timber Dev.*, 467 U.S. at 92. The majority thus has it backwards when it suggests that the doctrine's "objective should not be conflated with" the primary "rule"—the "'antidiscrimination principle'"—that courts have applied to implement that objective. Maj. Op. at 29 (quoting *Nat'l Pork Producers Council*, 598 U.S. at 369).

The Court has described the "fundamental objective" of the dormant Commerce Clause as "preserving a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *Gen. Motors Corp.*, 519 U.S. at 299. On its face, this objective is of course an odd fit for illegal markets. Even the majority acknowledges the obvious

---

[5] Specifically, the Court reasoned that requiring such clarity from Congress "reduces significantly the risk that unrepresented interests will be adversely affected by restraints on commerce." *S.-Cent. Timber Dev.*, 467 U.S. at 92. If that is the primary justification for requiring Congress to expressly authorize protectionist laws, however, the majority is not off to a good start. "[T]he Supreme Court has certainly never indicated that it is a constitutionally cognizable harm under the dormant Commerce Clause to 'adversely affect[]' out-of-state actors if their 'unrepresented interest[]' consists solely in peddling illicit goods." *Ne. Patients Grp.*, 45 F.4th at 559 n.1 (Gelpí, J., dissenting) (quoting *S.-Cent. Timber Dev.*, 467 U.S. at 92). And the majority's recognition that the dormant Commerce Clause never prohibits "incidentally burdens[ome]" laws in illegal markets suggests it agrees. Maj. Op. at 44.

10

"irony" of applying a doctrine implied from an affirmative grant of power to Congress to "'preserv[e] a national market'" that Congress does not want to exist. Maj. Op. at 29 (quoting *Gen. Motors Corp.*, 519 U.S. at 299).

Nevertheless, the majority concludes that the doctrine must apply to illegal markets—notwithstanding clear indicia of contrary congressional intent—because states could otherwise "shelter" in some such markets that are only "nominal[ly]" illegal or "candidate[s] for repeal." *Id.* at 30. The majority appears most concerned that a state could provide "advantages for their residents" in a market that Congress later legalizes, and thus "disturb[]" that future *legal* "national market." *Id.* at 30–31 (alteration accepted and internal quotation marks omitted).

As an initial matter, it is difficult to square this concern with the majority's concession that federal bans on interstate commerce can—at least "sometimes"—authorize *perfectly* protectionist state laws. *Id.* at 34. By concluding that such laws may be permissible, the majority encourages states to evade dormant Commerce Clause scrutiny through more flagrant protectionism. Yet any concern with states disturbing potential future legal markets would apply with greater force to more protectionist laws. Thus, even crediting the majority's concern, its solution only magnifies the problem.

11

In any event, I disagree with the majority that the potential future repeal of a federal prohibition provides any basis for requiring Congress to expressly authorize protectionist state legislation. For one, a "nominal[ly]" illegal market is still an illegal market—and thus one Congress does not want to exist. *Id.* at 30. Judicial intuitions about what Congress may hypothetically do in the future cannot possibly trump existing legislation as indicia of congressional intent. We should not settle for tea leaves when we can read a statute.

Moreover, even if we were to consider the possibility Congress may ultimately legalize marijuana, it is not at all clear to me that Congress would want the dormant Commerce Clause to apply before it has done so. As already discussed, application of the dormant Commerce Clause would compel a state that has elected to permit an intrastate marijuana market to open that market to interstate commerce. Yet localized markets may be invaluable to Congress as it assesses the comparative costs and benefits of legalizing marijuana—and whether to do so at the national level. One of the principal virtues of federalism is the ability for a state to "serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, *J.*, dissenting). And requiring states that permit

any commerce in marijuana to fully open their borders to interstate commerce would mean tearing down the laboratory walls.

For these reasons, the possibility of future legalization does not support the majority's requirement that Congress expressly authorize protectionist legislation in illicit markets. The same is true with respect to the possibility of so-called "knock-on effects" in *other* markets. *Ne. Patients Grp.*, 45 F.4th at 553.

The majority does not appear concerned with such effects, but because they figured heavily in the First Circuit's analysis, I consider them here. In concluding that the dormant Commerce Clause applies to the market for medical marijuana, the First Circuit emphasized "the potential for protectionist state regulation to stoke antagonism among the states." *Id.* at 552. It acknowledged that this risk "is likely to be greatest when the market at issue is a lawful one," but it nonetheless reasoned that there may be "potential for a trade war to be destructive" even when "its genesis could be traced to a single state's effort to attain predominance in a market that federal law deems unlawful." *Id.* at 552–53. Such a trade war, in the First Circuit's view, could "escalate and have knock-on effects." *Id.* at 553.

At the outset, however, any such trade war would not just originate in illegal markets; it would necessarily remain so confined. The dormant Commerce Clause

13

would continue to apply to *legal* commerce. And as a result, if a trade war spilled over into legal markets, "the parties to that broader dispute could ask the courts to intervene."[6] *Peridot Tree, Inc. v. City of Sacramento*, No. 2:22-cv-00289-KJM-SCR, 2024 WL 4857648, at *5 (E.D. Cal. Nov. 21, 2024).

The First Circuit's concern, then, reduces to one with the anticipated effects of a hypothetical trade war confined solely to illegal commerce. Might the possibility of such effects justify requiring Congress to expressly authorize protectionist legislation in a market it has already expressly criminalized? No matter how one frames the dormant Commerce Clause's purpose, the answer must be no.

To the extent the doctrine is concerned with advancing "national solidarity," *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 523 (1935), by heading off interstate conflict and resulting "Balkanization," *Tenn. Wine & Spirits Retailers Ass'n*, 588 U.S. at 517 (internal quotation marks omitted), it is difficult to imagine any meaningful

---

[6] Relatedly, to the extent one of the concerns here is that states might attempt to indirectly achieve discriminatory benefits in a legal market by enacting protectionist legislation in a related illegal market or submarket, the dormant Commerce Clause would continue to apply by reference to the broader legal market. Thus, if a state law that applies on its face only to illegal commerce nonetheless "harbor[s] a discriminatory purpose[] or discriminate[s] in its effect" with respect to legal commerce, courts could intervene to strike down the law. *N.Y. Pet Welfare Ass'n, Inc. v. City of New York*, 850 F.3d 79, 90 (2d Cir. 2017). This case presents no such concerns, however, as the market for marijuana is both well-defined and wholly illegal, and Variscite has not argued that New York's licensing scheme has a discriminatory purpose or effect with respect to any legal commerce.

14

threat to the "succe[ss]" of the "Union," *id.* (internal quotation marks omitted), arising from "rivalries and animosities," *Granholm v. Heald*, 544 U.S. 460, 473 (2005), in markets for federally illicit goods—markets that at least a majority of the states' representatives in Congress have agreed should not exist. *See also* The Federalist No. 7, at 63 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (warning that state protectionism could "lead to outrages, and these to reprisals and wars"). And to the extent the doctrine is concerned more with realizing the economic benefits of "free trade," *Bos. Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 335 (1977), and unencumbered "national market[s]," *Gen. Motors Corp.*, 519 U.S. at 299, the answer could not be any clearer: if Congress wants to eradicate a national market, it does not want that market to be "preserv[ed]," *id.*, let alone to "prosper[]," *H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 535 (1949). *See also* The Federalist No. 11, at 89 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (touting the economic benefits of "unrestrained intercourse between the States"). Rather, Congress welcomes impediments to illegal interstate commerce. And it certainly would not want states to be forced to remove them. Accordingly, the dormant Commerce Clause's purpose provides no basis for requiring Congress to expressly authorize protectionist legislation in federally illegal markets.

* * *

In sum, criminalization of a market is a sufficiently "unambiguous[]" express[ion]" of congressional "intent" to override the dormant Commerce Clause's application. *Hillside Dairy*, 539 U.S. at 66. And neither precedent nor policy requires further clarity from Congress. It bears emphasizing, however, that courts do not have the last word on this issue. Congress could of course enact legislation prohibiting state regulations that discriminate against out-of-state investment in marijuana markets, or it could achieve the same result by legalizing marijuana. The limited question we must resolve is what default presumption best furthers Congress's intent when it criminalizes a market.

As I understand the majority opinion, it adopts a presumption that criminalization renders the dormant Commerce Clause inapplicable (1) sometimes to perfectly protectionist laws, (2) never to imperfectly protectionist laws, and (3) always to incidentally burdensome laws. And to override this presumption, the majority requires Congress to simultaneously criminalize and bless protectionist legislation in a market. That approach cannot be reconciled with either common sense, congressional intent, or the dormant Commerce Clause's purpose. All three, rather, favor a presumption that when Congress criminalizes a market, it

16

does not want the dormant Commerce Clause's protections to apply. I respectfully dissent.